**QWEST CORPORATION,
Plaintiff–Appellant,**

**v.**

**COLORADO DIVISION OF PROPERTY TAXATION, DEPARTMENT OF LOCAL AFFAIRS, State of Colorado, Defendant–Appellee.**

No. 10CA1320.

Colorado Court of Appeals,
Div. II.

Aug. 4, 2011.

---

Opinion by Judge WEBB.

In this property tax dispute, plaintiff, Qwest Corporation ("Qwest"), appeals the

trial court's judgment granting the motion to dismiss of defendant, Colorado Division of Property Taxation, Department of Local Affairs, State of Colorado ("DPT"). According to Qwest, because some of its property is similar to that of cable service providers ("cable companies"), the tax statutes applied to cable companies' property should be interpreted to permit DPT to assess such Qwest property under these statutes, although Qwest is a public utility. Alternatively, Qwest asserts that denying it the tax benefits enjoyed by similarly situated cable companies, which are not public utilities, violates the constitutional guarantees of uniform taxation and equal protection.

We conclude that DPT reasonably interpreted the tax statutes at issue in applying them only to cable companies. We further conclude that DPT applied these statutes constitutionally because it could have done so based on administrative convenience. Therefore, we affirm.

## I. Background

DPT is responsible for determining "[t]he actual value for property tax purposes of the operating property and plant of all public utilities doing business in this state ...." § 39–1–103(3), C.R.S.2010. The definition of "public utility" includes telephone companies. § 39–4–101(3)(a), C.R.S.2010. Cable companies are not included in the definition of "public utility" and are specifically exempt from regulation under the "Intrastate Telecommunications Services" article and "the 'Public Utilities Law' of the state of Colorado." § 40–15–401(1)(a), C.R.S.2010. Because cable companies are not public utilities, their property is valued and taxed locally in the "county wherein such property is located." § 39–1–103(5)(a), C.R.S.2010.

DPT's valuation method for public utilities differs from that used by county assessors for property owned by non-utilities. *Compare* §§ 39–4–101 to –110, C.R. S.2010 (DPT's valuation method for public utilities), *with* § 39–1–103(5)(a) (county assessor's val-

uation method for real and personal property). Qwest concedes that as a telephone company, it is a public utility, but asserts that this classification does not justify differential taxation of Qwest property which is similar to property of cable companies providing comparable telephone services.

A DPT report, "Analysis of Telecommunication Company Property Tax Procedures and Recommendations for Statutory or Procedures [*sic*] Changes" (DPT Report)[1], states that certain incremental equipment used by cable companies to provide telephone services is being reported to DPT and centrally assessed as telephone company property. However, the DPT Report explains, infrastructure used by cable companies to complete telephone services as well as to provide traditional cable services continues to be reported and valued locally by county assessors as non-utility property. According to the complaint, "less than 10% of cable company property is presently being centrally assessed."

The DPT Report observed "profound and significant change" in the telecommunications industry, leading to traditional telephone companies and cable companies "providing generally the same services." The report noted that the ability of both types of companies to provide similar services created "equity issues" in property taxation. Specifically, it described application of sections 39–1–103(13) and 39–3–118, C.R.S.2010, to cable companies, but not to telephone companies, as "an illustration of disparate treatment for similar property that is similarly situated."

Qwest alleged that: it is similarly situated to cable companies which provide competing telephone services and use comparable property to that used by Qwest to provide such services; local assessment of cable company property is more favorable than central assessment of its property because local assessment includes an intangible property exemption, section 39–3–118, and caps the maximum taxable value of non-utility property based on the cost approach, section 39–1–

---

1. The complaint identifies and paraphrases this report. The record includes a complete copy. DPT does not dispute that we may consider it. *See Stauffer v. Stegemann,* 165 P.3d 713, 716

(Colo.App.2006) ("when, as here, the plaintiff attaches documents to the complaint, the court may consider those documents in ruling on a motion to dismiss").

103(13); and DPT's refusal to apply these provisions to utilities gives cable companies an unfair competitive advantage.

Qwest asked the trial court to interpret sections 39–3–118 and 39–1–103(13) as applying to its property or, in the alternative, to find DPT's refusal to do so unconstitutional under the uniform taxation provision of the Colorado Constitution, Colo. Const. art. X, § 3, and the Equal Protection Clause of the United States Constitution, U.S. Const. amend. XIV. The trial court found Qwest's statutory interpretation arguments to be precluded by *United States Transmission Systems, Inc. v. Bd. of Assessment Appeals,* 715 P.2d 1249 (Colo.1986) (specific statutory provisions governing public utilities control over more general provisions), and the deference owed to DPT's interpretation. It also rejected Qwest's constitutional claims, explaining that for tax purposes, "the Colorado legislature has classified telephone companies differently from cable companies ... [,] and that classification is not unreasonable or arbitrary ... because telephone companies are regulated differently from cable companies." The court concluded that Qwest had "not stated a claim for which relief can be granted under any theory of law," and granted DPT's motion to dismiss.

We begin with Qwest's statutory interpretation argument because if it is correct, Qwest's constitutional challenges would become moot. *See, e.g., Adams County School Dist. No. 50 v. Heimer,* 919 P.2d 786, 790 (Colo.1996) ("when possible, statutes should be construed so as to avoid questions of their constitutional validity").

## II. Statutory Interpretation

Qwest contends DPT can and should interpret the intangible property exemption, section 39–3–118, and the "cost cap" limitation on value, section 39–1–103(13), as applying to its property. We reject Qwest's position on both statutes.

Initially, we address DPT's assertion that because Qwest did not plead a separate declaratory relief claim based on its statutory interpretation arguments, they are properly before us "only if the [DPT's] interpretation is unconstitutional." While Qwest did not

plead such a separate claim, we conclude that its allegations and prayer for relief sufficiently raised these issues. *See Hemmann Management Services v. Mediacell, Inc.,* 176 P.3d 856, 859 (Colo.App.2007) ("in assessing a C.R.C.P. 12(b)(5) motion to dismiss, courts liberally construe the pleadings and resolve all doubts in favor of the pleader"). Thus, as did the trial court, we treat Qwest's statutory interpretation arguments as a separate claim.

We review questions of statutory interpretation de novo. *Bd. of County Comm'rs v. ExxonMobil Oil Corp.,* 192 P.3d 582, 585 (Colo.App.2008), *aff'd,* 222 P.3d 303 (Colo. 2009). Our principal task is to determine and effectuate the legislature's intent. *Jefferson County Bd. of Equalization v. Gerganoff,* 241 P.3d 932, 935 (Colo.2010). "We begin by looking to the express language of the statute, construing words and phrases according to grammar and common usage." *Id.* But here, we must strictly construe the statutory provisions at issue. § 39–1–101, C.R.S.2010 ("the provisions of said articles [1 through 13 of title 39] shall be strictly construed").

If we conclude "that the statute is unambiguous and the intent appears with reasonable certainty, our analysis is complete." *Gerganoff,* 241 P.3d at 935. If we determine that the statute is ambiguous, however, we use interpretive aids to select "among reasonable interpretations of the particular language chosen by the legislature." *Union Pac. R.R. Co. v. Martin,* 209 P.3d 185, 188 (Colo.2009). And in property tax cases, while decisions of DPT "do not bind our construction of the applicable law, we consult and ordinarily defer to ... [its] guidance, rules, and determinations, if they accord with the constitutional and statutory provisions they implement." *Washington County Bd. of Equalization v. Petron Development Co.,* 109 P.3d 146, 150 (Colo.2005).

### A. Intangible Property Exemption

█ Section 39–1–103(3) states that "[t]he actual value for property tax purposes of the operating property and plant of all public utilities doing business in this state shall be determined by the administrator, as provided

in article 4 of this title." Under article 4, "The administrator shall determine the actual value of the operating property and plant of each public utility as a unit, giving consideration to the following factors [including] ... [i]ts intangibles." § 39–4–102(1)(b), C.R.S.2010.

Qwest first asserts that the reference in section 39–1–103(3) to article 4 establishes only *who* must assess public utility property, not *how* such assessments are to be conducted. This assertion assumes that the limiting clause "as provided in article 4" modifies only "by the administrator" and not also "shall be determined." We reject this assumption for two reasons.

First, it ignores the more grammatically-correct reading that where, as here, a limiting clause "occurs at the end of the sentence and is set off by a comma, [it] thereby modif[ies] all the preceding language." *People v. Johnson,* 167 P.3d 207, 209 (Colo.App.2007), *abrogated on other grounds by Pellman v. People,* 252 P.3d 1122, 1127 (Colo.2011); *see also Pena v. Industrial Claim Appeals Office,* 117 P.3d 84, 87 (Colo.App.2004) ("proximity of [a] limiting clause to the immediately preceding language does not create a presumption of statutory intent"). Second, even if section 39–1–103(3) does not preclude applying exemptions beyond those listed in article 4, the plain language of section 39–4–102(1)(b) still requires DPT to consider a public utility's intangibles.[2] *See Leggett & Platt, Inc. v. Ostrom,* 251 P.3d 1135, 1141 (Colo.App.2010) (if possible, we read statutory provisions "as a whole, construing each consistently and in harmony with the overall statutory design"); *see also Bennett Bear Creek Farm Water & Sanitation Dist. v. City & County of Denver,* 928 P.2d 1254, 1262 (Colo.1996) ("We must give effect to the meaning, as well as every word of a statute if possible.").

Nevertheless, Qwest asserts that sections 39–3–118 and 39–4–102(1)(b) can be read harmoniously if the DPT administrator considered "the existence" of a public utility's intangibles when calculating its unit value; separately valued those intangibles; and then deducted that value from the unit value. Because the unit value of the public utility may be greater than the sum of its parts, the net effect could be a higher unit value after subtracting the separate value of its intangibles than if the intangibles had not been considered. Thus, according to Qwest, only this synergy value of the intangibles should be taxed.[3]

This argument comports with the view that "the true measure of value of the property of a public utility is its worth as an integrated and operating unit rather than the sum of the values of the various components making up that unit." *United States Transmission Systems, Inc.,* 715 P.2d at 1256. But Qwest's interpretation of "consider" would be difficult to reconcile with the following language in *United States Transmission Systems, Inc.,* 715 P.2d at 1258:

> We see no necessary conflict between the exemption of intangible personal property, as such, from taxation and the mandate to consider intangibles when valuing public utility property on a unitary basis. To the extent that the two statutory provisions may be read to conflict, the special provision for public utility taxation must prevail over the general exemption for intangible personal property.

Qwest attempts to distinguish *United States Transmission Systems, Inc.* in two ways. First, it asserts that the supreme court could have "see[n] no necessary conflict" between the two provisions only by implicitly recognizing Qwest's higher unit value approach. Second, it asserts that because the court perceived no conflict between the provisions, its statement that "the special

---

2. For this reason, we reject Qwest's further argument that DPT should apply the intangible property exemption because Qwest benefits from other non-article 4 exemptions such as that for inventories of merchandise, materials, and supplies under section 39–3–119, C.R.S.2010. Qwest fails to identify any such exemption that directly conflicts with a provision under article 4,

as the intangible property exemption does with section 39–4–102(1)(b).

3. Some jurisdictions have adopted the valuation method Qwest advances. *See, e.g., GTE Sprint Communications Corp. v. County of Alameda,* 26 Cal.App.4th 992, 32 Cal.Rptr.2d 882 (1994).

provision for public utility taxation must prevail over the general exemption for intangible personal property" was dicta. For the following reasons, neither assertion is persuasive.

In *United States Transmission Systems, Inc.*, the court said without reservation that intangibles are to be taxed: "the intangible rights of a public utility that directly contribute to its operations are to be considered as a factor in valuing *and taxing* the operating property and plant of the public utility." *Id.* at 1256 (emphasis added). It explained, "property taxation of a public utility in Colorado is not precluded simply because the only portion of the public utility's operating property and plant found within this state is [its] intangible rights. . . ." *Id.* at 1256–57. But despite this detail, it said nothing about considering only the higher value that might be attributed to intangibles using the "integrated and operating unit" approach. Further, if Qwest's interpretation would have avoided any conflict, the court need not have invoked the principle that a "special provision" requiring consideration of intangibles takes precedence over a "general exemption." And, we are generally reluctant to treat the supreme court's statements as mere dicta. *See, e.g., Allstate Ins. Co. v. Blount,* 491 F.3d 903, 915 (8th Cir.2007) ("Although this isolated statement could be characterized as dictum, we are nonetheless reluctant to disregard such a plain statement from the Missouri Supreme Court.").

Accordingly, because our conclusion rests on the plain language of the provisions, and is consistent with *United States Transmission Systems, Inc.*, we need not utilize interpretive aides.

### B. Cost Cap

■ Under section 39–1–103(13)(a), "the cost approach shall establish the maximum value of [personal] property. . . ." Qwest asserts that despite DPT's contrary interpretation, this " 'cost cap' approach [applies] to the valuation of *all* personal property" (emphasis in original), including that of public utilities. We conclude that even assuming the statute could be read this way, DPT's interpretation is reasonable, and therefore is entitled to deference.

Section 39–4–102(1) directs the administrator to "determine the *actual value* of the operating property and plant of each public utility as a unit. . . ." (Emphasis added.) This directive is limited only by the specific factors to be considered. *See id.* By contrast, section 39–1–103(13)(a) does not mention actual value but, rather, specifies that as among the "cost approach, market approach, and income approach," the cost approach "shall establish the maximum value of property," subject to the limitation that "all costs incurred in the acquisition and installation of such property are fully and completely disclosed by the property owner to the assessing officer."

The "cost cap" in section 39–1–103(13) could be inconsistent with determining actual value under section 39–4–102(1) because, as Qwest asserts, "a premise of the 'unit' method is that the value of public utility property may be higher when it is operated as part of a going concern 'unit'. . . ." *Cf. United Parcel Service of America, Inc. v. Huddleston,* 981 P.2d 223, 226 (Colo.App.1999) ("the operating property and plant valued as a unit is the public utility's property and plant that is used in carrying on its business"). However, the cost approach does not reflect such a higher value, but consists of separately valuing each piece of property and aggregating the individual values. Thus, because the cost approach could understate the going concern value, using it as a cap would contradict the actual value mandate of section 39–4–102(1).[4] Hence, we are reluctant to imply a similar limitation because the legislature could have, but did not, included such a limitation on valuing public utilities in section 102(1). *See, e.g., Shelter Mutual Ins. Co. v. Mid–Century Ins. Co.,* 214 P.3d 489, 493 (Colo.App.2008) (previous use of word or phrase in statute

---

4. Using the cost approach would also increase the burden on the DPT administrator. In addition to determining the utility's unit value as a going concern, the administrator would be required to assess the separate value of each individual piece of property, aggregate those values, and then use the aggregated value, if it was less than the going concern value.

shows that legislature knows its use and meaning), *aff'd*, 246 P.3d 651 (Colo.2011).

Nevertheless, Qwest argues that it is entitled to the "cost cap" based on the use of "assessing officer" in section 39–1–103(13), in contrast to other provisions of the property tax statute which use "assessor." *See, e.g.*, § 39–1–103(5)(a) ("[a]ll real and personal property shall be appraised . . . by the assessor . . .").[5]

" 'Assessor' means the elected assessor of a county . . . ." § 39–1–102(2), C.R.S.2010. Qwest asserts that because the statute does not define "assessing officer," it includes the DPT administrator. Thus, according to Qwest, the mandate in section 39–1–103(13) that "an assessing officer" employ the "cost cap" applies to DPT. However, despite the legislative failure to define "assessing officer," DPT's interpretation that the "cost cap" does not apply to Qwest is reasonable, on two grounds.

First, Qwest cites no authority, nor have we found any, treating the DPT administrator as an "assessing officer." But several cases assume equivalency between "assessing officer" and the local "assessor." *See, e.g.*, *Home Federal Savings Bank v. Larimer County Bd. of Equalization*, 857 P.2d 562, 563 (Colo.App.1993) (describing "specific factors to be used by *an assessor* " in determining value of vacant land and quoting statutory provision as to method employed by "assessing officers" (emphasis added) (citation omitted)).

Second, section 39–4–102(1) specifically covers public utilities and mandates "actual value" assessment, without regard to a "cost cap." Therefore, implying that the DPT administrator must employ a "cost cap," in the absence of any specific statutory direction, would conflict with this mandate. *See, e.g.*, *Waste Management of Colorado, Inc. v. City of Commerce City*, 250 P.3d 722, 725 (Colo.App.2010) (reading statutory provisions as a

whole, "consistently and in harmony with the overall statutory design").

Thus, because DPT's interpretation of these statutes is reasonable, we defer to that interpretation. *See Petron Development Co.*, 109 P.3d at 150. Accordingly, we reject Qwest's statutory interpretation arguments.

### III.   Equal Protection and Uniform Taxation

Qwest also contends the trial court erred in summarily rejecting its claims that DPT's interpretation and application of sections 39–3–118 and 39–1–103(13) deny it the guarantees of uniform taxation and equal protection. We discern no constitutional violation.

### A.   Standard of Review

We review a trial court's decision on a motion to dismiss de novo. *Abts v. Bd. of Educ.*, 622 P.2d 518 (Colo.1980). Like the trial court, we must accept as true all averments of material fact contained in the complaint. *Shapiro & Meinhold v. Zartman*, 823 P.2d 120 (Colo.1992). We draw all reasonable inferences in the plaintiff's favor. *Story v. Bly*, 217 P.3d 872, 876 (Colo.App. 2008), *aff'd*, 241 P.3d 529 (Colo.2010).

A statute is presumed to be constitutional, and at trial the plaintiff must establish that the statute is unconstitutional beyond a reasonable doubt. *E.g.*, *Jensen v. City & Cnty. of Denver*, 806 P.2d 381, 384 (Colo.1991). Hence, to survive a motion to dismiss, the plaintiff must allege facts that, if true, could show the statute's unconstitutionality beyond a reasonable doubt. *See Rinn v. Bedford*, 102 Colo. 475, 478, 84 P.2d 827, 828 (1938).[6]

However, we disagree with DPT's assertion that Qwest's complaint must negate "every conceivable basis which might support [the tax classification]." Such a burden may be appropriate for summary judgment or at trial. *See, e.g.*, *American Mobilehome Ass'n*,

---

5. However, as in section 39–1–103(13), other provisions also use "assessing officer." *See, e.g.*, § 39–1–103(11) (describing circumstances in which the "assessing officer" is not to consider "minerals in place" when determining the value of real property).

6. We are bound to employ this standard, notwithstanding its anomalies. *See, e.g.*, *United Air Lines, Inc. v. City & County of Denver*, 973 P.2d 647, 659 (Colo.App.1998) (Briggs, J., specially concurring) (describing the standard as neither "needed" nor "useful"), *aff'd*, 992 P.2d 41 (Colo. 2000).

*Inc. v. Dolan,* 191 Colo. 433, 438, 553 P.2d 758, 762 (1976). But dismissal for failure to state a claim affords no opportunity to present evidence necessary to meet this burden, and pleading at this level of detail would be contrary to the principle of notice pleading. C.R.C.P. 8(a).

We need not address DPT's assertion that Qwest "lacks standing to assert" underreporting by cable companies of the infrastructure they use for telephone services. This assertion mistakenly presumes that Qwest is challenging the tax benefits enjoyed by cable companies. Instead, the complaint asserts a constitutional right "to a reduction in value [of Qwest property] to the level at which cable companies have been assessed."

We reject DPT's invitation to avoid this constitutional issue by treating the tax differential as within its substantial discretion to investigate and remedy alleged episodic underreporting by any cable company. DPT fails to identify anything in the record that supports this position. Further, the complaint alleges that "the denial of the cost approach 'cap' and the intangibles exemption conferred to similarly situated taxpayers is systemic and intentional."

## B. Equality and Uniformity in Property Taxation

Before 1982, the Colorado Constitution's "uniform taxation" article provided, in relevant part: "All taxes shall be uniform upon each of the various classes of real and personal property located within the territorial limits of the authority levying the tax...." Colo. Const. art. X, § 3(1)(a) (amended 1982). The "Gallagher Amendment" altered the provision to provide, as relevant here: "Each property tax levy shall be uniform upon all real and personal property not exempt from taxation under this article located within the territorial limits of the authority levying the tax." Colo. Const. art. X, § 3(1)(a). The federal Equal Protection Clause states, in relevant part: "No State shall ... deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1.

Qwest argues that after the Gallagher Amendment, the uniform taxation article provides a higher standard of equal protection than does the federal Equal Protection Clause. However, it does not assert that the level of protection offered by these provisions differed before the Gallagher Amendment, nor does it cite any Colorado case before the amendment that applied a two-tiered analysis.

To the contrary, of the few cases in which the two provisions have been analyzed simultaneously, none has distinguished between them, and some have described them as co-extensive. *See, e.g., Dolan,* 191 Colo. at 437–38, 553 P.2d at 762 ("Under the Uniformity of Taxation Clause of the Colorado Constitution as well as the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, the legislature may make classifications in the area of taxation so long as the classification is a reasonable one and not palpably arbitrary."); *see also In re Estate of Hunter,* 97 Colo. 279, 286, 49 P.2d 1009, 1012 (1935) (noting that to comply with federal equal protection and state uniformity principles, the tax must operate alike on all subjects under similar circumstances).

Therefore, we first examine whether the statutory provisions were constitutionally applied under the pre-Gallagher framework, treating the uniform taxation article of the Colorado Constitution as co-extensive with the federal Equal Protection Clause. After determining that the provisions were constitutionally applied to Qwest under that clause, we then address whether the uniform taxation article compels a contrary conclusion because of the Gallagher Amendment. We conclude that it does not.

## C. Pre–Gallagher

A law challenged on equal protection grounds is subject to rational basis review, unless the law involves a suspect classification or infringes on a fundamental constitutional right, either of which requires review under heightened scrutiny. *FCC v. Beach Communications, Inc.,* 508 U.S. 307, 313, 113 S.Ct. 2096, 124 L.Ed.2d 211 (1993). Qwest does not assert that the interpretation of the statutes at issue either involves a suspect classification or infringes on fundamental

rights. *See Thorpe v. State,* 107 P.3d 1064, 1071 (Colo.App.2004) ("plaintiffs have cited no authority, and we are aware of none, holding that statutes creating classifications for tax purposes implicate fundamental rights").

■ "The Constitution presumes that, absent some reason to infer antipathy, even improvident [legislative] decisions will eventually be rectified by the democratic process." *Vance v. Bradley,* 440 U.S. 93, 97, 99 S.Ct. 939, 59 L.Ed.2d 171 (1979). Therefore, under rational basis review, courts will not invalidate a statute merely because it appears unfair or better policy choices could have been implemented. *Beach Communications,* 508 U.S. at 313–14, 113 S.Ct. 2096.

■ Courts are "especially deferential in the context of classifications made by complex tax laws." *Nordlinger v. Hahn,* 505 U.S. 1, 11, 112 S.Ct. 2326, 120 L.Ed.2d 1 (1992); *see also Dolan,* 191 Colo. at 437, 553 P.2d at 762 ("In taxation, even more than in other fields, the legislature has greater freedom to classify."). A tax classification survives rational basis review if it passes a three-part test:

there is a plausible policy reason for the classification, the legislative facts on which the classification is apparently based rationally may have been considered to be true by the governmental decisionmaker, and the relationship of the classification to its goal is not so attenuated as to render the distinction arbitrary or irrational.

*Fitzgerald v. Racing Ass'n of Central Iowa,* 539 U.S. 103, 107, 123 S.Ct. 2156, 156 L.Ed.2d 97 (2003) (quoting *Nordlinger,* 505 U.S. at 11–12, 112 S.Ct. 2326).

First, the governmental decisionmaker must base the classification on a policy reason that is legitimate and plausible. One such reason is the government's interest in its own efficient and effective operation. *See, e.g., Carmichael v. S. Coal & Coke Co.,* 301 U.S. 495, 511, 57 S.Ct. 868, 81 L.Ed. 1245 (1937) ("Administrative convenience and ex-

pense in the collection or measurement of the tax are alone a sufficient justification for the difference between the treatment of small incomes or small taxpayers and that meted out to others.") (citations omitted). The objective of operating efficiently and effectively can, in turn, spur the government to conserve its limited resources, which is also a legitimate reason for creating classifications. *See, e.g., Beach Communications,* 508 U.S. at 317, 113 S.Ct. 2096 (finding legitimate government agency's reason of "conserve[ing] regulatory energies and allow[ing] the most cost effective use of available resources," in dissimilar treatment of certain television facilities for franchise requirements) (internal quotation marks and citation omitted).[7]

■ Second, the classification must rest on legislative facts that "rationally may have been considered to be true by the governmental decisionmaker." *Nordlinger,* 505 U.S. at 11, 112 S.Ct. 2326. But a legitimate reason for the classification need only be plausible—the actual policy reason relied on by the governmental decisionmaker is irrelevant, so long as a legitimate one can be conceived. *Beach Communications,* 508 U.S. at 315, 113 S.Ct. 2096 ("a legislative choice is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data"); *Nordlinger,* 505 U.S. at 15–16, 112 S.Ct. 2326 ("the Equal Protection Clause does not demand for purposes of rational-basis review that a legislature or governing decisionmaker actually articulate at any time the purpose or rationale supporting its classification"). Hence, the decisionmaker need not prove any underlying facts on which the classification could be based. *Beach Communications,* 508 U.S. at 315, 113 S.Ct. 2096; *see also Minnesota v. Clover Leaf Creamery Co.,* 449 U.S. 456, 466, 101 S.Ct. 715, 66 L.Ed.2d 659 (1981) ("the Equal Protection Clause is satisfied by our conclusion that the Minnesota Legislature *could rationally have decided* that its ban on plastic nonreturnable milk

7. *See also Jefferson v. Hackney,* 406 U.S. 535, 549, 92 S.Ct. 1724, 32 L.Ed.2d 285 (1972) (upholding welfare benefit reduction for some individuals because "budgetary constraints [did] not allow the payment of the full standard of need for all welfare recipients"); *cf. U.S. R.R. Ret. Bd. v. Fritz,* 449 U.S. 166, 176–79, 101 S.Ct. 453, 66 L.Ed.2d 368 (1980) (upholding law reducing railroad retirement benefits for some individuals).

jugs might foster greater use of environmentally desirable alternatives" (emphasis in original)).

■ Third, the classification need not be drawn "with mathematical nicety" because the issues facing governments "are practical ones and may justify, if they do not require, rough accommodations ...." *Dandridge v. Williams*, 397 U.S. 471, 485, 90 S.Ct. 1153, 25 L.Ed.2d 491 (1970) (quotation marks and citations omitted); *Thorpe*, 107 P.3d at 1072 ("[A] classification need not be perfect, and a law is not invalid simply because it may result in some inequality.") (internal quotation marks and citations omitted). Rather, the classification only needs to rationally further the law's purpose and not be "so attenuated as to render the distinction arbitrary or irrational." *Nordlinger*, 505 U.S. at 10–11, 112 S.Ct. 2326.

We reject Qwest's assertion that a more rigorous analysis is required by *District 50 Metropolitan Recreation Dist. v. Burnside*, 167 Colo. 425, 431, 448 P.2d 788, 791 (1968). That case articulated the rational basis test as requiring the contested classification to be:

> reasonable and not arbitrary and ... based upon substantial differences having a reasonable relation to the objects or persons dealt with and to the public purpose sought to be achieved by the legislation involved.[8]

Qwest cites no Colorado property tax case since *District 50* that has articulated the test this way, nor are we aware of any. Other such cases, including ones that cite *District 50* approvingly, have articulated the rational basis test as more deferential toward the governmental decisionmaker. *See Dolan*, 191 Colo. at 438, 553 P.2d at 762 ("If the classification conceivably rests upon some reasonable considerations of difference or policy, there is no constitutional violation."); *Friends of Chamber Music v. City & County of Denver*, 696 P.2d 309, 321 (Colo.1985) ("[T]he requirements of equal protection are satisfied if (1) the legislative classification bears some reasonable relation to a legitimate state interest, and (2) all persons within a class are treated in the same manner.") (quoting *First Nat'l Bank v. Bd. of Cnty. Comm'rs*, 189 Colo. 128, 132, 538 P.2d 427, 429 (1975)).[9]

We also disagree with Qwest that *District 50*'s articulation of the test applies because the plaintiff there, like Qwest here, suffered dismissal for failure to state a claim. Qwest cites no case, nor have we found any, in which the substantive equal protection analysis—as contrasted from the standard of review—was affected by the posture of the case. The equal protection guarantee remains the same regardless of the stage at which the trial court decides the case.

Our inquiry is further circumscribed because Qwest neither disputes its statutory classification as a public utility nor alleges that cable companies should be so classified. Rather, Qwest contends only that its property must receive the same tax benefits as similar property used by cable companies to

8. This formulation of the test, from 12 Am.Jur. *Constitutional Law* § 469, was first adopted in Colorado in *Champlin Refining Co. v. Cruse*, 115 Colo. 329, 333, 173 P.2d 213, 215 (1946).

9. We are not persuaded by the out-of-state authority on which Qwest relies. In *Racing Ass'n of Central Iowa v. Fitzgerald*, 675 N.W.2d 1 (Iowa 2004), the Iowa Supreme Court interpreted its state constitution to provide greater equal protection than the federal constitution in property tax matters. In Colorado, such a determination is the province of the supreme court. *See, e.g., People in Interest of A.C.*, 991 P.2d 304, 307 (Colo.App.1999) ("extending rights protected under our state constitution beyond those protected by the federal constitution has been largely within the domain of the supreme court"), *aff'd*, 16 P.3d 240 (Colo.2001). *Verizon New England,* *Inc. v. City of Rochester*, 156 N.H. 624, 940 A.2d 237 (2007), is inapposite. First, the court did not articulate a more stringent rational basis test but, rather, inquired as to whether the government's "selective taxation is reasonably related to a legitimate state interest." *Id.* at 244. Second, although the court discerned an equal protection violation, it did so because the government "offers, the record reveals, and we can conceive of, no rational reason for selectively imposing this tax upon Verizon, and not upon other utilities that use and occupy public property in the same manner as Verizon." *Id.* By contrast, here Qwest's claim is not premised upon disparate treatment as between itself and other utilities and, as addressed, *infra*, we can conceive of a rational reason for taxing utilities differently than non-utilities.

provide telephone services. DPT responds that its application of the tax provisions is rational because: Qwest is a public utility and cable companies are not; public utilities are regulated differently than non-utilities; such regulation is "relatively favorable" to public utilities; and public utilities operate in multiple jurisdictions. Qwest replies that these differences either require factual analysis not possible on this record or do not have a sufficient nexus to tax policy.

We agree that whether the overall economic impact of the regulatory structure favors Qwest[10] or it operates more broadly throughout the state than cable companies providing competitive telephone services can be decided only by the trial court after creating an evidentiary record. We decline to decide whether the definitional and regulatory differences between public utilities and non-utilities sufficiently implicate tax policy to satisfy the rational basis test, even assuming that the nexus could be determined on the present record.

■ Instead, we conclude that DPT's application of the tax statutes to value utility property as a unit could rationally have been based on administrative convenience. Accommodating Qwest's concerns would require DPT to employ a multi-step process involving at least the following:

- Identify non-utilities that provide competing services to those offered by utilities;

- Determine which property of such utilities is exclusively or at least primarily involved in providing the services subject to competition;

- Back that property out of the utilities' unit values (as discussed in the preceding section); and

- Apply the cost cap and intangible exemption to that property.

We recognize that DPT did not raise administrative convenience before the trial court and has not argued it on appeal. However, had DPT done so below, the factual record before us on de novo review—the

complaint and the DPT report—would be the same. Further, we "may affirm a correct judgment based on reasoning different from that relied on by the trial court." *Steamboat Springs Rental & Leasing, Inc. v. City & County of Denver,* 15 P.3d 785, 786 (Colo. App.2000); *see Whidden v. People,* 78 P.3d 1092, 1092 n. 1, 1093 (Colo.2003) (affirming court of appeals but "employ[ing] different reasoning" that was not argued "in any of the proceedings below"). We perceive this principle as particularly applicable here because the actual policy reason relied on by DPT need not be determined, so long as a sufficient one can be conceived. *See Beach Communications,* 508 U.S. at 315, 113 S.Ct. 2096; *Nordlinger,* 505 U.S. at 15–16, 112 S.Ct. 2326; *see also Arangold Corp. v. Zehnder,* 329 Ill.App.3d 781, 263 Ill.Dec. 631, 768 N.E.2d 391, 400 (2002) ("the court may simply hypothesize reasons for the legislation"), *aff'd,* 204 Ill.2d 142, 272 Ill.Dec. 600, 787 N.E.2d 786 (2003).

Qwest's allegation, confirmed by the DPT report, that some "equipment used by cable companies … is apparently being reported to DPT to be taxed as 'telephone company' property within DPT's assessment jurisdiction," does not disprove administrative convenience. The complaint alleges that less than 10% of cable company property used to provide telephone services is valued and assessed centrally. Thus, achieving the equality Qwest demands would still require the multi-step process discussed above as to a significant amount of property.

Finally, Qwest's assertion that the trial court failed to accept concessions in the DPT Report of "equity issues" and "disparate treatment for similar property," which Qwest argues at least requires us to remand for an evidentiary hearing, is also unavailing. First, because our review is de novo, the trial court's reasoning has no bearing on our decision. *See, e.g., People v. Terry,* 791 P.2d 374, 376 (Colo.1990). Second, even if the classification based on status as a public utility results in some inequity, the administrative convenience aspect of the rational basis test

---

**10.** For instance, Qwest asserts that it derives no net benefit from the regulatory structure because the guaranteed return on investment is offset by the obligation to provide service in unprofitable areas.

does not demand that the governmental decisionmaker choose the best possible solution. *See Beach Communications,* 508 U.S. at 315, 113 S.Ct. 2096; *Clover Leaf Creamery Co.,* 449 U.S. at 470, 101 S.Ct. 715; *Thorpe,* 107 P.3d at 1072.

In sum, because DPT could reasonably have concluded that apportioning and valuing public utility property as Qwest asserts would result in administrative inconvenience, we discern no equal protection violation by DPT in refusing to interpret and apply the statutes as Qwest urges.

### D. Post–Gallagher

■ We reject Qwest's further assertion that by removing the phrase "each of the various classes" from Colo. Const. art. X, § 3(1)(a), the Gallagher Amendment broadened the uniformity requirement so as to preclude the separate tax classification of public utilities. Even assuming that the amendment restricts the legislature's ability to make tax classifications by *property type*,[11] we disagree that it restricts classifications based on ownership—i.e., public utilities and cable companies.

Qwest relies on Legislative Council of the Colorado General Assembly, *An Analysis of 1982 Ballot Proposals* (Research Publication No. 269, 1982) ("Blue Book"), as well as Attorney General's Opinion, Attorney General File No. 0AG8303218–LM (1983), 1983 WL 167529 ("AG opinion"). But neither authority addresses ownership-based classifications.

The Blue Book noted that the Gallagher Amendment "would not permit the General Assembly to adjust assessments for *specific classes of property.*" (Emphasis added.) It further explained:

[T]he statutes now provide for reduced valuation for assessment or special provisions with regard to determining actual value for the following *classes of property* : property used in the production of gasohol,

works of art, rehabilitation of certain older residential property, renovation of certain older commercial buildings that are part of a public redevelopment project, and property utilized in developing alternate energy sources.

(Emphasis added.) *See Carrara Place, Ltd. v. Arapahoe County Bd. of Equalization,* 761 P.2d 197, 203 (Colo.1988) ("The legislative council's interpretation, while not binding, provides important insight into the electorate's understanding of the amendment when it was passed.").

After the amendment passed, the AG opinion concluded that certain statutes reducing valuation for specific classes of property had been "repealed by implication." Later, the legislature repealed all of the statutes protecting the classes of property that the Blue Book mentioned. *See* §§ 39–1–104(13) & (14) (gasohol plants), 39–5–105(2)(a) (remodeled residential), 39–5–105(3) (commercial renovation), 39–1–104(6) (alternative energy devices), 39–1–104(15) (works of art), C.R.S. 2010; Ch. 268, 1987 Colo. Sess. Laws 1304 (deeming the first four statutes "inconsistent with the property tax provisions of section 3 of article X of the constitution of the state of Colorado").

While Qwest's interpretation of the Gallagher Amendment as restricting the legislature's ability to create tax classifications based on property type has support, here it is unavailing. Qwest's opening brief states the constitutional issue as, "Qwest is denied tax benefits provided to similarly situated taxpayers merely because it is a public utility." Thus, the disparate taxation of which Qwest complains rests on its classification as a public utility, not on the "specific classes of property" involved.[12]

Based on the Blue Book, we conclude that the Gallagher Amendment did not prohibit the legislature from creating a tax classifica-

---

**11.** Such a conclusion is less than certain. *See, e.g., Fidelity Castle Pines, Ltd. v. State,* 948 P.2d 26, 31 (Colo.App.1997) (upholding tax classification of "all vacant land") (emphasis deleted).

**12.** Indeed, while Qwest argues that "it is no longer constitutional for public utilities to be

considered a separate class ... [,]" it concedes that "[w]hether *taxpayers* can be separated into classes other than those recognized in Colorado's constitution is an open question." (Emphasis added.)

tion based on status as a public utility,[13] and therefore the amendment does not alter our conclusion that DPT constitutionally applied sections 39–3–118 and 39–1–103(13) to Qwest.

Nor do ownership-based classifications infringe constitutional rights, so long as they satisfy the rational basis test. *See, e.g., Nordlinger*, 505 U.S. at 12–17, 112 S.Ct. 2326 (holding that tax classification between recent and long-term homeowners was reasonably related to neighborhood preservation and protection of long-term owners' reliance interest against paying higher taxes); *see also City of Indianapolis v. Armour*, 946 N.E.2d 553, 563–64 (Ind.2011) (city's classification, between property owners who owed outstanding assessments for sewer replacement and those who had paid in full was reasonably related to legitimate interests, including "reducing its administrative costs," "preserving its limited resources," and "providing relief for property owners experiencing financial hardship").

We are not persuaded otherwise by Qwest's citation to out-of-state cases [14] that, it asserts, "impose greater limitations on the power of legislatures to create classes for differential taxation." It argues that after the Gallagher Amendment, "[t]he textual language of the Colorado Constitution is now more similar to the language of [these] other states' uniformity clauses...." But the state constitutions in three of the four cases that Qwest cites contain the "same class" language that the Gallagher Amendment eliminated from the Colorado Constitution.[15]

■ Finally, we decline to address Qwest's assertion, made during oral argument, that the intangible property exemption is unconstitutional because the Gallagher Amendment limits exemptions to those expressly identified in the constitution. *See Bd. of County Comm'rs v. City of Greenwood Village*, 30 P.3d 846, 849 (Colo.App.2001) (court will not consider arguments raised for first time during oral argument). Qwest did not make this assertion in its complaint, nor did it seek to have section 39–3–118 declared unconstitutional. Although the opening brief cites *Bd. of County Comm'rs v. Vail Assocs., Inc.*, 19 P.3d 1263, 1275–76 (Colo.2001) (the legislature "may not create exemptions not contained in the constitution"), Qwest then argues only that "it is no longer constitutional for public utilities to be considered a separate class for purposes of denying them exemptions and valuation methods available to other taxpayers."

## IV. Conclusion

Because we conclude that Qwest failed to state a claim as a matter of law, the judgment is affirmed.

DAILEY and STERNBERG *, JJ., concur.

---

**13.** We need not decide whether a legislative classification by ownership might be challenged because it accomplishes indirectly what the Gallagher Amendment prohibits, *see, e.g., Game and Fish Commission v. Feast*, 157 Colo. 303, 306, 402 P.2d 169, 170 (1965) (agreeing with trial court's ruling that "the legislation in question was an attempt by the legislature to tax by indirection what cannot be taxed in direct fashion ..."), because Qwest does not make this argument.

**14.** *Citizens Telecommunications Co. v. Arizona Dep't of Revenue*, 206 Ariz. 33, 75 P.3d 123 (Ariz.Ct.App.2003); *Idaho Telephone Co. v. Baird*, 91 Idaho 425, 423 P.2d 337 (1967), *overruled by*

*Simmons v. Idaho State Tax Comm'n*, 111 Idaho 343, 723 P.2d 887, 892–93 (1986); *Northern Natural Gas Co. v. State Bd. of Equalization & Assessment*, 232 Neb. 806, 443 N.W.2d 249 (1989), *overruled by Vandenberg v. Butler County Bd. of Equalization*, 281 Neb. 437, 796 N.W.2d 580, 584 (2011); *Inter Island Telephone Co. v. San Juan County*, 125 Wash.2d 332, 883 P.2d 1380 (1994).

**15.** Only the Nebraska Constitution art. VIII, § 1, does not contain the "same class" language.

\* Sitting by assignment of the Chief Justice under provisions of Colo. Const. art. VI, § 5(3), and § 24–51–1105, C.R.S.2010.