**Mark Steven PELLMAN, II, Petitioner**

v.

**The PEOPLE of the State of Colorado, Respondent.**

**No. 09SC375.**

Supreme Court of Colorado, En Banc.

June 6, 2011.

McClintock & McClintock, P.C., Elizabeth A. McClintock, Theodore P. McClintock, Colorado Springs, Colorado, Attorneys for Petitioner.

John W. Suthers, Attorney General, Wendy J. Ritz, First Assistant Attorney General, Denver, Colorado, Attorneys for Respondent.

Justice EID delivered the Opinion of the Court.

Section 18–3–405.3, C.R.S. (2010) makes it a felony for a person to have unlawful sexual contact with a child victim while occupying "a position of trust." Petitioner Mark Pellman argues that he was not in a position of trust at the time of the unlawful sexual contact between himself and the child victim in this case, L.B., because he was not performing a specific supervisory task at the time that the contact occurred.

The court of appeals held that Pellman was in a position of trust at the time of the unlawful sexual contact because he had an overall charge of duty or responsibility with regard to L.B. that extended over a long relationship. *People v. Pellman*, No. 07CA1063, 2009 WL 712370 (Colo.App. Mar. 19, 2009).

We granted certiorari[1] and now affirm the court of appeals. We hold that a defendant need not be performing a specific supervisory task at the time of the unlawful act in order to occupy a position of trust. Instead, a defendant may assume a position of trust through an ongoing and continuous supervisory relationship with the victim. Here, we find that there is sufficient evidence in the record, when viewed in the light most favorable to the prosecution, that Pellman had assumed a continuous and ongoing supervisory role in relation to L.B. in his capacity as a

---

1. We granted certiorari on the following issue: Whether the court of appeals incorrectly interpreted the statutory definition of "position of trust" by failing to give effect to the language of the statute requiring an actor to be in a position of trust "at the time of the unlawful act."

church youth volunteer and family friend, and that the unlawful contact occurred while Pellman occupied that role.

## I.

Defendant Mark Pellman was charged with and convicted of one count of sexual assault on a child victim aged fifteen to seventeen while in a position of trust pursuant to section 18–3–405.3(1), C.R.S (2010). Evidence presented at trial established that during the summer of 2005, Pellman, who was forty-four years old at the time, initiated a romantic relationship with fifteen-year-old L.B. During the summer, Pellman's relationship with L.B. progressed steadily, beginning with rubbing his foot on L.B.'s leg under the dinner table at her home. Over the course of the summer, Pellman removed L.B.'s top and bra, kissed and fondled her breasts, and touched her bottom and genitalia over her clothes.

Pellman was a friend of L.B.'s parents and attended the same church as L.B.'s family. L.B.'s father was the pastor of the church. From 2000 to 2003, Pellman taught Sunday school at the church and L.B. was a student of his. On several occasions, Pellman and his wife had watched L.B. and her sisters while L.B.'s parents were out of town. At the invitation of L.B.'s parents, Pellman and his family often joined L.B.'s family for dinners at L.B.'s home. Pellman regularly helped L.B. and her sisters with their school work. During the summer of 2005, L.B. occasionally went to Pellman's house—with her parents' permission—to ride horses.

In May 2005, Pellman fondled L.B.'s foot underneath the dinner table at L.B.'s parents' house. In the coming weeks, L.B. went to Pellman's house with her parents' permission between four and six times to ride horses with Pellman. Pellman hugged L.B. and rubbed her neck during these visits.

On July 8, 2005, Pellman kissed L.B. for the first time while she was at his residence riding horses. Sometime in late July, Pellman came to L.B.'s home while L.B.'s parents were not present; the two kissed and Pellman touched L.B.'s bottom over her clothing. In mid-July, Pellman assisted with the kids' club associated with the church. L.B. also assisted with the kids' club. On July 20, Pellman was a chaperone on a field trip to Elitch Gardens, an amusement park, to reward those such as L.B. who had assisted with the kids' club. During the Elitch Gardens trip, Pellman kissed L.B. while they were alone for a few moments.

During July and August, Pellman met with L.B. without her parents' knowledge three to four times per week and engaged in unlawful sexual contact with her, taking off all of her clothes above her waist and fondling her breasts, and touching her buttocks and genitalia over her clothing. L.B. often told her parents that she was going out for a run, but instead she would meet Pellman by his vehicle. L.B. did not tell her parents about these meetings because she did not want them to know.

On August 23, 2005, L.B. told her parents about the nature of her relationship with Pellman. Pellman was arrested that same night. During his arrest, Pellman admitted his relationship with L.B. to both the police officer and L.B.'s father.

Pellman was charged with sexual contact with a child by a person in a position of trust pursuant to section 18–3–405.3(1). The information charged Pellman with the time frame between July 8, 2005 and August 23, 2005. Pellman was convicted. He subsequently filed a post-verdict motion for judgment of acquittal, which was denied.

On appeal to the court of appeals, Pellman argued that there was insufficient evidence that he was in a position of trust with respect to L.B. at the time the unlawful sexual conduct occurred. More specifically, he argued that there was insufficient evidence that he was acting in a position of trust at the time of the unlawful sexual contact because he only was in a position of trust at specific times, the last of which was when he chaperoned the trip to Elitch Gardens in late July 2005.

The court of appeals rejected this argument and affirmed Pellman's conviction. The court held that Pellman was in a position of trust at the time of the unlawful sexual contact because he had an overall charge of duty or responsibility with regard to L.B.

that extended over a long relationship. *Pellman,* slip op. at 6–7. Judge Richman dissented. Relying heavily on *People v. Johnson,* 167 P.3d 207 (Colo.App.2007), Judge Richman concluded that Pellman was not acting in a position of trust at the time that the unlawful sexual contact occurred with L.B. because he was not under a specific charge of supervision at the time the contact occurred. *Pellman,* slip op. at 23–25 (Richman, J., dissenting).

■ We now affirm the court of appeals. We hold that a defendant need not be performing a specific supervisory task at the time of the unlawful act in order to occupy a position of trust. Instead, a defendant may assume a position of trust through an ongoing and continuous supervisory relationship with the victim. Here, we find that there is sufficient evidence in the record, when viewed in the light most favorable to the prosecution, that Pellman had assumed a continuous and ongoing supervisory role in relation to L.B. in his capacity as a church youth volunteer and family friend, and that the unlawful contact occurred while Pellman occupied that role.

## II.

This case turns upon the meaning of a position of trust pursuant to section 18–3–405.3, which defines the crime of sexual assault on a child by one in a position of trust. Section 18–3–405.3(1) makes it a felony to "knowingly subject[ ] another not his or her spouse to any sexual contact . . . if the victim is a child less than eighteen years of age and the actor committing the offense is *one in a position of trust with respect to the victim*" (emphasis added).[2] Section 18–3–401(3.5) defines "position of trust" as follows:

One in a "position of trust" includes, but is not limited to, any person who is a parent or acting in the place of a parent and charged with any of a parent's rights, duties, or responsibilities concerning a child, including a guardian or someone otherwise responsible for the general supervision of a child's welfare, or a person who is charged with any duty or responsibility for the health, education, welfare, or supervision of a child, including foster care, child care, family care, or institutional care, either independently or through another, *no matter how brief, at the time of the unlawful act.*

§ 18–3–401(3.5) (emphasis added). Pellman contends (and the dissent below agreed) that there was insufficient evidence that he was acting in a position of trust "at the time of the unlawful act[s]" because he only was in a position of trust at specific times, the last of which was when he chaperoned the trip to Elitch Gardens in late July 2005. *See Pellman,* slip op. at 24 (Richman, J., dissenting).[3] In other words, Pellman argues that the phrase "at the time of the unlawful act" requires that a defendant be performing a specific supervisory task at the time of the unlawful act in order to occupy a position of trust. We disagree.

We begin by observing that the definition of "position of trust" adopted by the legislature is a broad one. The definition makes plain that it is only illustrative, stating that "[o]ne in a 'position of trust' includes, but is not limited to," the examples that follow. § 18–3–401(3.5). The "includes, but is not limited to" language suggests an "expansion or enlargement" and "a broader interpretation." *Ruff v. Indus. Claim Appeals Office,* 218 P.3d 1109, 1113 (Colo.App.2009) (interpreting a similar phrase in the workers'

---

**2.** Section 18–3–401(4), C.R.S. (2010) defines "sexual contact" as "the knowing touching of the victim's intimate parts by the actor, or of the actor's intimate parts by the victim, or the knowing touching of the clothing covering the immediate area of the victim's or actor's intimate parts if that sexual contact is for the purposes of sexual arousal, gratification, or abuse." "Intimate parts" are defined as "the external genitalia or the perineum or the anus or the buttocks or the pubes or the breast of any person." § 18–3–401(2).

**3.** Pellman concedes that he had unlawful sexual contact with L.B. at various times; however, he argues that he was not in a position of trust at any of the times during which the unlawful sexual contact occurred. Because we find, as discussed below, that Pellman was in a position of trust until August 23, 2005, when L.B. told her parents of the nature of her relationship with Pellman, and because the evidence shows that there was unlawful sexual contact prior to that date, we need not pinpoint the specific times at which the unlawful sexual contact occurred.

compensation context). The examples that follow the "includes, but is not limited to" language are broad as well. For instance, a person in a position of trust includes "a person who is charged with *any duty or responsibility* for the ... supervision of a child." § 18–3–401(3.5) (emphasis added). Indeed, any such responsibility—"no matter how brief"—will qualify. *Id.*

Pellman interprets this language to require that, in order to be acting in a position of trust, a defendant must be performing a specific supervisory task at the time that the unlawful contact occurs. The language, however, does not impose such a requirement. While a "brief" or discrete "duty or responsibility" may be sufficient to place a defendant in a position of trust, nothing in the language suggests that a defendant must be performing a specific supervisory task at the time the unlawful contact occurs. Instead, a defendant may assume a position of trust under sections 18–3–405.3(1) and 18–3–401(3.5) through an ongoing and continuous supervisory relationship with the victim. As long as the unlawful sexual contact occurred while this supervisory relationship existed, the unlawful sexual contact occurred "at the time of the unlawful act."

 In this case, we find that there is sufficient evidence in the record, when viewed in the light most favorable to the prosecution,[4] that Pellman had assumed a continuous and ongoing supervisory role in relation to L.B. in his capacity as a church youth volunteer and family friend, and that the unlawful contact occurred while Pellman occupied that role.

L.B.'s father was the pastor of a small church to which Pellman belonged. From 2000 to 2003, Pellman taught Sunday school at the church and L.B. was a student of his. On several occasions, Pellman and his wife had watched L.B. and her sisters while L.B.'s parents were out of town. Pellman and his family often joined L.B.'s family for dinner, and he regularly helped L.B. and her sisters

with their school work. L.B. also occasionally went to Pellman's house to ride horses.

In May 2005, Pellman fondled L.B.'s foot underneath the dinner table at L.B.'s parents' house. In the coming weeks, L.B. went to Pellman's house with her parents' permission between four and six times to ride horses with him. On July 8, 2005, Pellman kissed L.B. for the first time while she was at his residence riding horses. Sometime in late July, Pellman came to L.B.'s home while L.B.'s parents were not present; the two kissed and Pellman touched L.B.'s buttocks over her clothing.

Pellman was an assistant in the kids' club associated with the church, with which L.B. also assisted. On July 20, 2005, the church sponsored a trip to Elitch Gardens as a reward to kids' club volunteers. Pellman served as a chaperone on that trip, during which Pellman and L.B. kissed.

From late July through the end of August, Pellman met with L.B. without her parents' knowledge almost daily and engaged in sexual contact with her, taking off all of her clothes above her waist and fondling her breasts, and touching her buttocks and genitalia over her clothing. L.B. told her parents that she was going out for a run, but instead she would meet Pellman by his vehicle. This conduct continued until August 23, 2005, when L.B. told her parents about the nature of her relationship with Pellman. L.B.'s father testified that, prior to August 23, 2005, he "was always comfortable with [Pellman], never questioned whether I would have any concern with him with my kids."

It is clear that Pellman at times performed discrete acts of supervision of L.B.—for example, while acting as a chaperone at the Elitch Gardens trip, assisting with the kids' club, or supervising the horseback riding. But these discrete acts of supervision were the product of the general position of trust that Pellman had assumed in relation to L.B. Pellman still held this position of trust when the unlawful sexual contact occurred in late July and August 2005. The evidence shows

4. "When assessing the sufficiency of the evidence in support of a guilty verdict, a reviewing court must determine whether any rational trier of fact might accept the evidence, taken as a whole and in the light most favorable to the prosecution, as sufficient to support a finding of the accused's guilt beyond a reasonable doubt." *People v. Sprouse,* 983 P.2d 771, 777 (Colo.1999).

that the position of trust continued until August 23, 2005, when L.B. told her parents of the sexual contact with Pellman, at which time he was arrested. Accordingly, we find there is sufficient evidence that Pellman occupied a position of trust when the unlawful sexual contact occurred.

We note that Pellman's interpretation of "position of trust" would allow individuals to avoid prosecution by committing unlawful sexual contact while "off duty." For example, under Pellman's interpretation, a teacher who engages in unlawful sexual contact with a student over school break would not be performing a specific supervisory task at the time, and therefore not be in a position of trust. However, that teacher would have assumed a continuous and ongoing supervisory role in the student's life, and therefore, under the interpretation that we recognize today, would be acting in a position of trust at the time of the unlawful contact.

In adopting the position of trust statute, the legislature focused on those instances in which a defendant has gained access to a child through the position of trust he or she holds. A person in a position of trust is more likely to be alone with a child, successfully lure a child to a place of isolation, or manipulate a child to submit to abuse or keep it a secret. *People v. Martinez,* 51 P.3d 1046, 1052 (Colo.App.2001), *rev'd on other grounds,* 74 P.3d 316 (Colo.2003). Our interpretation today recognizes that the special access to the child that a defendant has gained through occupying a position of trust may continue even where a defendant is not acting pursuant to a discrete supervisory task. *See, e.g., People v. Luman,* 994 P.2d 432, 438 (Colo.App.1999) (finding the defendant was in a position of trust when he lived in the same residence as the victim and her family, contributed to household income, and the victim was the only child whom the defendant allowed in his room).

We recognize that our holding today is in some tension with another court of appeals case, *People v. Johnson,* 167 P.3d 207 (Colo. App.2007); *Pellman,* slip op. at 28 (Richman, J., dissenting) (noting the tension between the panel majority's opinion and *Johnson*). In *Johnson,* the court of appeals held that there are two inquiries that the statute requires: "(1) Was the actor a parent, acting in the place of a parent, or *charged with certain enumerated responsibilities* for the care, education, welfare, or supervision of a child, for any period of time, no matter how brief?; and (2) Did the actor commit an unlawful act during that period of entrustment?" 167 P.3d at 210–11 (emphasis added). *Johnson's* first factor implies that a defendant must be charged with a specific supervisory task at the time of the unlawful act in order for a defendant to be in a position of trust, an interpretation we reject. However, we agree with *Johnson* that the position of trust must be in place when the unlawful act occurs.

The facts of *Johnson* are illustrative. In that case, the defendant was the fifteen-year-old victim's driving instructor for several days in March 2004. *Id.* at 208. At the end of the five-day driving course, the defendant and the victim exchanged numbers and talked on the telephone over the course of the next two months. In May 2004, the defendant and the victim met in person and engaged in unlawful sexual activity at least fifteen times over the next four months. *Id.* While the defendant was in a position of trust while he was the victim's driving instructor, the position of trust had come to an end at the conclusion of the driving course. Specifically, the prosecution presented no evidence that the defendant's position of trust extended beyond the five-day driving course. *Id.* at 210. Based on this lack of evidence, the court of appeals concluded that the defendant "was no longer entrusted with [the victim's] care and education after her driving lessons terminated," and that therefore the position of trust charges against the defendant were properly dismissed. *Id.* We agree with the result in *Johnson:* the statutory language requires that a defendant be in a position of trust at the time the unlawful sexual contact occurs, and there was no evidence presented in that case that the defendant occupied such a position of trust when the unlawful sexual contact occurred. Here, by contrast, the record contains sufficient evidence that Pellman occupied a position of trust until L.B. told her parents that sexual contact had occurred.

A position of trust for purposes of sections 18–3–405.3 and 18–3–401(3.5) may be a supervisory position that exists for a "brief" period—a matter of hours or days—or it may extend over a long relationship, such as in this case. Here, we determine that there was sufficient evidence that Pellman was in a position of trust at the time that the unlawful sexual contact occurred.

### III.

For the foregoing reasons, we affirm the court of appeals.

Justice MÁRQUEZ does not participate.