The summaries of the Colorado Court of Appeals published opinions
constitute no part of the opinion of the division but have been prepared by
the division for the convenience of the reader. The summaries may not be
cited or relied upon as they are not the official language of the division.
Any discrepancy between the language in the summary and in the opinion
should be resolved in favor of the language in the opinion.

SUMMARY
February 27, 2020

## 2020COA33

**No. 18CA1121, *People v. Pratarelli* — Crimes — First Degree
Kidnapping — Elements — Forcibly Seize and Carry**

A division of the court of appeals considers the meaning of the

"forcibly seizes and carries" element in the first degree kidnapping

statute, where the defendant was convicted of kidnapping his own

child. The division adopts the plain meaning of the words "force"

and "forcibly" and concludes that, in order to prove the "forcibly

seizes and carries" element of the offense, the prosecution needed to

prove that the defendant used (or threatened to use) power,

violence, or pressure against his daughter in order to seize and

carry her, and that he did so against opposition or resistance. The

division further concludes that, because no custody order restricted

the defendant's right to the care, custody, and control of his child,

the evidence was insufficient to show that he forcibly seized and

carried his daughter.  Because the evidence did not show that the defendant forcibly seized and carried his daughter, the division vacates the first degree kidnapping conviction and sentence.

The division also considers and rejects the defendant's claim that the district court impaired his ability to investigate mental condition evidence and thus violated his constitutional right to present a defense.  The division therefore affirms the remaining convictions.

COLORADO COURT OF APPEALS                                    **2020COA33**

Court of Appeals No. 18CA1121
Pueblo County District Court No. 16CR2182
Honorable Kimberly Jo Karn, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Marcello Enrique Pratarelli,

Defendant-Appellant.

JUDGMENT AFFIRMED IN PART, VACATED IN PART,
AND CASE REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE DUNN
Román and Casebolt*, JJ., concur

Announced February 27, 2020

Philip J. Weiser, Attorney General, Paul E. Koehler, First Assistant Attorney
General, Daniel E. Rheiner, Assistant Attorney General Fellow, Denver,
Colorado, for Plaintiff-Appellee

The Noble Law Firm, LLC, Antony Noble, Taylor Ivy, Lakewood, Colorado, for
Defendant-Appellant

*Sitting by assignment of the Chief Justice under provisions of Colo. Const. art.
VI, § 5(3), and § 24-51-1105, C.R.S. 2019.

¶ 1    Defendant, Marcello Enrique Pratarelli, appeals his judgment of conviction entered on jury verdicts finding him guilty of first degree kidnapping, second degree kidnapping, use of a stun gun, and third degree assault. Because insufficient evidence supports it, we vacate the first degree kidnapping conviction. But we affirm the remaining convictions.

I.    Background and Procedural History

¶ 2    Mr. Pratarelli and his wife separated in September 2016. After the separation, they agreed to jointly parent their three-year-old daughter. But they didn't obtain a parenting time (or custody) order. Instead, they proceeded under an informal, flexible parenting arrangement that varied from week to week, depending on their respective schedules. Under this arrangement, on days that Mr. Pratarelli parented their daughter, he usually kept her overnight and returned her to daycare the next morning.

¶ 3    At trial, Mr. Pratarelli and his wife agreed that, consistent with their parenting arrangement, Mr. Pratarelli picked their daughter up from daycare on the afternoon of November 7, 2016. Mr. Pratarelli testified that later that night he spoke with his wife on the telephone and confronted her about text messages she had

exchanged with another man.  After the call ended, Mr. Pratarelli explained that he "packed [his daughter] up in the car," believing a drive would help her fall asleep.  Once in the car, Mr. Pratarelli decided to drive to his wife's house to continue the confrontation about the texts.

¶ 4     When he reached his wife's house, he waited in his car with his daughter asleep in the back seat.  His wife testified that, when she arrived home, Mr. Pratarelli opened her car door, pushed her against the console, stunned her with a taser, grabbed her by the hair, and dragged her down the driveway.  Two neighbors testified that they heard someone screaming, went outside, and saw Mr. Pratarelli run to his car and drive away.

¶ 5     Back in the car with his still-sleeping daughter, Mr. Pratarelli first decided to drive to El Paso, Texas (where he testified his sister lived) but ultimately drove to Mexico.  While there, Mr. Pratarelli and his wife communicated via telephone and email.  At trial, his wife testified that she begged Mr. Pratarelli to return their daughter, and she "assure[ed] him that [she] would drop all of the charges, and he would have unsupervised visitation."  She testified she offered these concessions to get her daughter back.  She explained

2

that Mr. Pratarelli eventually said, "okay, we'll get it in writing," and the two arranged to meet in Mexico. They did, and his wife then returned to the United States with their daughter.

¶ 6 After Mr. Pratarelli returned to Colorado, he was arrested and charged with second degree kidnapping, use of a stun gun, third degree assault, and criminal mischief. These charges all related to Mr. Pratarelli's altercation with his wife.

¶ 7 Months later, the prosecution filed an amended complaint and information charging Mr. Pratarelli with two counts related to his daughter — first degree kidnapping and violation of custody. The prosecution later dismissed the violation of custody charge.

¶ 8 The jury acquitted Mr. Pratarelli of criminal mischief, but otherwise convicted him as charged. The district court then sentenced Mr. Pratarelli to a total of nine years in prison for the crimes related to his wife and, consecutive to that, eleven years for first degree kidnapping.

## II. Parental Rights

¶ 9 Every parent has a fundamental right to the care, custody, and control of their child. *Troxel v. Granville*, 530 U.S. 57, 66 (2000); *accord In re Parental Responsibilities Concerning B.J.*, 242

3

P.3d 1128, 1135 (Colo. 2010). "'Legal custody' may be taken from a parent only by court action." § 19-1-103(73)(a), C.R.S. 2019; *see also* § 14-10-108, C.R.S. 2019 (authorizing a court to issue temporary orders allocating parental responsibilities in a dissolution of marriage case); 14-10-124, C.R.S. 2019 (requiring a court to allocate parental responsibilities in a dissolution case).[1] Without such an order, parents share unrestricted custodial rights. *See Armendariz v. People*, 711 P.2d 1268, 1270 (Colo. 1986). So, absent a custody order, a parent generally may not be convicted of kidnapping his own child. *See Commonwealth v. Beals*, 541 N.E.2d 1011, 1013 (Mass. 1989) (acknowledging the general rule that, absent a custody order, neither parent "commits the crime of kidnapping by taking exclusive possession of the child"); 1 Am. Jur. 2d *Abduction and Kidnapping* § 35, Westlaw (database updated Jan. 2020). While some states have legislated otherwise, *see, e.g.*, Ariz.

---

[1] Although we use the term "custody," we recognize that in dissolution of marriage proceedings, the legislature replaced the term "custody" with "parental responsibilities." § 14-10-103(4), C.R.S. 2019. Because this isn't a dissolution of marriage case, and the new term doesn't change "the legal rights of any custodial parent with respect to the child," *id.*, we use the word "custody" when referring to Mr. Pratarelli's legal rights with respect to his daughter.

Rev. Stat. Ann. § 13-1302(A)(2) (2019), Colorado has only directly addressed parental kidnapping in its violation of custody order statute. *See People v. Armendariz*, 684 P.2d 252, 257-58 (Colo. App. 1983) (Tursi, J., dissenting in part) ("[T]he General Assembly has not chosen to criminalize the act of one parent taking a child from the physical custody of another parent, absent a court order granting custody to the other parent."), *aff'd in part and rev'd in part*, 711 P.2d 1268 (Colo. 1986); *see also* Legislative Council of the Colo. Gen. Assembly, Preliminary Revision of Colorado Criminal Laws, Research Pub. No. 98, at 20-22 (Nov. 1964) (recommending the addition of the crime of violation of custody to address the gap in law where one parent takes a child in violation of a custody order); Ch. 121, sec. 1, § 40-3-304, 1971 Colo. Sess. Laws 422 (adding violation of custody crime to address parental kidnapping).

¶ 10    Consistent with this rule, our supreme court has concluded that "[i]n the absence of a court order granting legal or physical custody," parents "share[] an equal right to the custody of the[ir] child." *Armendariz*, 711 P.2d at 1270. And because a parent with legal custody of a child cannot ordinarily seize that child "without . . . consent" (an element of second degree kidnapping), our

5

supreme court has held that a parent with legal custody cannot commit second degree kidnapping. *Id.* (vacating father's second degree kidnapping conviction); *cf. Lee v. People*, 53 Colo. 507, 511, 127 P. 1023, 1025 (1912) (affirming kidnapping conviction where father took his child in violation of a custody decree); *People v. Metcalf*, 926 P.2d 133, 141 (Colo. App. 1996) (affirming second degree kidnapping conviction where father seized child in violation of a custody order).

¶ 11 Despite this constitutional overlay and the undisputed fact that Mr. Pratarelli and his wife had no custody order, the interplay between the first degree kidnapping charge and Mr. Pratarelli's unrestricted custodial rights was never considered at trial. Nor do the parties do so here. Indeed, neither Mr. Pratarelli nor the People address how Mr. Pratarelli could "take possession of" (that is seize) his daughter when he already had the unrestricted legal right to her care, custody, and control. *See Metcalf*, 926 P.2d at 137 ("seize" means "to take possession of forcibly, to grasp, to snatch or to put in possession" (quoting Black's Law Dictionary 1219 (5th ed. 1979))); Webster's Third New International Dictionary 2057 (2002) ("seize" means "to take possession of"); *see also* § 19-1-103(73)(a).

¶ 12    But because the parties don't address whether a parent with unrestricted physical and legal custody can seize his own child under the first degree kidnapping statute, we turn to Mr. Pratarelli's sufficiency challenge.

### III.    Sufficiency of the Evidence

¶ 13    Mr. Pratarelli contends that the prosecution presented "no evidence" that he "forcibly" seized and carried his daughter and, thus, the first degree kidnapping conviction must be vacated. Under the circumstances here, we agree.

### A.    Standard of Review

¶ 14    We review sufficiency claims de novo. *People v. Rediger*, 2018 CO 32, ¶ 55. In doing this, we consider whether the evidence, when viewed in the light most favorable to the prosecution, was "both substantial and sufficient to support the conclusion by a reasonable mind that the defendant was guilty beyond a reasonable doubt." *Id.* A criminal verdict may not be based on guessing, speculation, or conjecture. *People v. Perez*, 2016 CO 12, ¶ 25.

¶ 15    We also interpret statutes de novo. *Id.* at ¶ 8. In doing so, our primary task is to give effect to the legislature's intent. *McCoy v. People*, 2019 CO 44, ¶ 37. To do that, we look first to the plain

language of the statute. *Id.* A commonly accepted meaning is preferred over a strained or forced interpretation. *People v. Voth*, 2013 CO 61, ¶ 21. When determining the common meaning of undefined statutory words, we may consider a recognized dictionary definition. *See id.* at ¶ 23; *People v. Hunter*, 2013 CO 48, ¶ 10 (determining the plain meaning of the statutory term "stranger" by consulting Webster's New College Dictionary and Black's Law Dictionary).

## B. First Degree Kidnapping

¶ 16    A person commits first degree kidnapping if, as relevant here, he "[f]orcibly seizes and carries any person from one place to another" "with the intent thereby to force the victim or any other person to make any concession or give up anything of value in order to secure a release of a person under the offender's actual or apparent control." § 18-3-301(1)(a), C.R.S. 2019.[2]

¶ 17    The General Assembly didn't define "forcibly" or "force" in the first degree kidnapping statute. So we consider the dictionary definitions to determine the meaning of these undefined, though

---

[2]  Unless otherwise indicated, references to the first degree kidnapping statute are to subsection 301(1)(a).

8

common, terms. The dictionary tells us that "forcible" means "[e]ffected by force or threat of force against opposition or resistance." Black's Law Dictionary 788 (11th ed. 2019); *see also* Webster's Third New International Dictionary at 888 (defining "forcible" as "effected by force used against opposition or resistance: obtained by compulsion or violence"). And "force" means "[p]ower, violence, or pressure directed against a person or thing." Black's Law Dictionary at 787.

¶ 18　　Applying these definitions, the prosecution had to show that Mr. Pratarelli used (or threatened to use) power, violence, or pressure against his daughter to seize and carry her, and that he did so against opposition or resistance. After reviewing the record, we see no evidence that Mr. Pratarelli did. Specific to the "forcibly seize and carry" element, the record here shows only that

- per the agreement with his wife, Mr. Pratarelli picked his daughter up from daycare on Monday, November 7, 2016;
- she continued in his care all afternoon and evening;
- he later put her in his car to go for a drive;
- she fell asleep in the car;

9

- she remained sleeping in the car when he assaulted his wife; and

- after the assault, he drove with his still-sleeping daughter to Mexico.

¶ 19    Put simply, nothing in this evidence shows Mr. Pratarelli used any force (or threat of force) to seize and carry his daughter.  More to the point, no evidence shows he used (or threatened to use) power, violence, or pressure against his daughter to seize and carry her against opposition or resistance.

¶ 20    This is perhaps unsurprising given that the focus of the kidnapping charge at trial was not on the "forcibly seize and carry" element, but on the concession element.  *See* § 18-3-301 (The forcible seizure and carrying must be "with the intent . . . to force the victim or any other person to make any concession or give up anything of value in order to secure a release of a person under the offender's actual or apparent control.").  To the extent the prosecution addressed the "forcibly seize and carry" element at all, it did so briefly.  For instance, in his opening statement, the prosecutor said that Mr. Pratarelli drove to Mexico "without [his wife's] permission."  But *Armendariz* teaches that because no

custody order limited his right to the care, custody, and control of his daughter, Mr. Pratarelli didn't need his wife's permission or consent to exercise control over his daughter. 711 P.2d at 1270; *see also* § 19-1-103(73)(a).

¶ 21    Later, in closing argument, the prosecutor referenced the "forcibly seize and carry" element just once, saying only that Mr. Pratarelli's daughter "can't move herself. She can't drive herself. Her parent does that. He carries her, he moves her from one location to the other . . . and that's why he is guilty . . . ." But again, that's nothing more than a statement that Mr. Pratarelli carried his daughter; the prosecution never clearly identified how Mr. Pratarelli forcibly took possession of his daughter (assuming, as already discussed, that a custodial parent can in fact "seize" his own child). At most, the evidence showed that Mr. Pratarelli took physical custody of his daughter at daycare under an agreed parenting time arrangement. That's the only evidence of any "seizure" we see in the record. But the prosecution never argued Mr. Pratarelli seized his daughter when he picked her up at daycare, and once he picked her up, Mr. Pratarelli exercised uninterrupted legal custody over his daughter.

11

¶ 22    Despite all this, the People argue we should affirm the first degree kidnapping conviction.  To get there, the People first urge us to read an illegal purpose or illegal intent element into the first degree kidnapping statute.  Since the General Assembly chose not to include such elements in the statute, neither may we.  *See Turbyne v. People*, 151 P.3d 563, 567 (Colo. 2007) (a court may not add words to a statute).

¶ 23    The People next assert that Mr. Pratarelli's exercise of parental authority "to put his daughter in the car" and drive her to Mexico shows he used "power" and that is sufficient to prove he forcibly seized and carried his daughter.  But because Mr. Pratarelli had physical and legal custody of his daughter, the parental relationship isn't sufficient to show that Mr. Pratarelli directed power against his daughter to seize and carry her over opposition or resistance.  To the extent the People suggest he took his daughter to Mexico over his wife's opposition, as already explained, he didn't need his wife's permission to exercise control over their daughter.  *See Armendariz*, 711 P.2d at 1270.

¶ 24    In their final salvo, the People argue that assuming the prosecution presented no evidence that Mr. Pratarelli "expressly

12

used force either to seize or carry" his daughter, "there was still sufficient evidence" to support the conviction because "there was testimony" that Mr. Pratarelli's daughter "was restrained from leaving her father's car." But we see two problems with this argument. First, the cited testimony doesn't say that. Rather, the testimony sets forth Mr. Pratarelli's explanation for driving to Texas. That testimony is not sufficient to prove that Mr. Pratarelli used force to seize and carry his daughter over opposition or resistance. Second, the argument appears to hinge on whether Mr. Pratarelli's daughter consented to go with her father. But because Mr. Pratarelli had legal custody of his daughter, he could consent for her. *See id.* ("[C]onsent must be given by those having legal custody of the child.").

¶ 25    All this said, we need not speculate as to whether some circumstance might exist in which a custodial parent could "forcibly seize and carry" his own child within the meaning of the first degree kidnapping statute. If such a case exists, it's not this one.

¶ 26    In the end, we conclude insufficient evidence supported Mr. Pratarelli's first degree kidnapping conviction. We therefore must vacate that conviction and sentence.

## C. Second Degree Kidnapping

¶ 27 Anticipating this outcome, the People argue that because second degree kidnapping is a lesser included offense of first degree kidnapping, we should remand the case with instructions to "enter a conviction for second-degree kidnapping." In so arguing, the People disregard the supreme court's *Armendariz* decision, which held that a custodial parent may not be convicted of second degree kidnapping. *See* 711 P.2d at 1270.

¶ 28 For this reason, we decline the People's request to instruct the district court to enter a second degree kidnapping conviction in place of the vacated first degree kidnapping conviction related to Mr. Pratarelli's daughter.

## IV. Bill of Particulars

¶ 29 Mr. Pratarelli next argues that the district court erred by denying his motion for a bill of particulars on the first degree kidnapping charge. Because we vacate the first degree kidnapping conviction, we need not consider this contention.

## V. Mental Health Concerns

¶ 30 Last, Mr. Pratarelli contends that the district court impaired his ability to investigate "mental condition evidence" and thus

violated his constitutional right to present a defense. More specifically, he argues the district court erred by (1) denying his second requested continuance to investigate a mental health defense; (2) not ordering a mental health examination; and (3) restricting his testimony about his memory and cognition. We perceive no reversible error.

## A. Additional Facts

¶ 31 When Mr. Pratarelli was taken into custody, law enforcement allegedly described him as "incoherent" and sent him to a hospital. Either during or after his hospitalization, Mr. Pratarelli learned he needed heart surgery. To accommodate the needed surgery and recovery, the court delayed the case.

¶ 32 Several months after the surgery, the prosecution filed its amended information and complaint. At the preliminary hearing on the added first degree kidnapping charge, Mr. Pratarelli's counsel raised concerns that the prosecution didn't disclose a journal Mr. Pratarelli had kept while he was in Mexico.

¶ 33 After receiving the journal, Mr. Pratarelli's counsel moved to continue the trial, arguing the journal "rais[ed] some issues concerning mental-health questions and that sort of thing." And

counsel explained that he was "exploring" those issues "at the present time." The court granted the continuance and rescheduled the trial four months later.

¶ 34 But less than a month before the rescheduled trial, Mr. Pratarelli again moved to continue the trial. This time, he pointed to a recent MRI that "confirmed cerebral small vessel disease," which "leads to cognitive decline and decrease in executive functioning." He argued the MRI raised "concerns regarding [Mr. Pratarelli's] ability" to form the requisite culpable mental state. After a hearing, the court denied the motion, finding that (1) the first continuance "was based on the same information"; (2) the court had granted that continuance to allow defense counsel "to try to look into those particular issues"; (3) defense counsel was "aware from very early on" that Mr. Pratarelli presented to law enforcement as confused or "having some sort of problems"; and (4) "there is no evidence that [Mr. Pratarelli's] current condition was in effect at the time of the allegations, or that it's relevant in any way."

¶ 35 Undeterred, Mr. Pratarelli filed an amended motion to continue, attaching a cardiologist's letter stating that cerebral small vessel disease "can lead to cognitive and executive impairment" and

"could lead to possible interference with his reactions to stress." The letter offered no opinions about Mr. Pratarelli's current mental condition or his condition two years earlier, when the charged events occurred. The district court once again denied the request, finding no evidence that Mr. Pratarelli "was suffering from [a mental] condition" when the charged events took place.

¶ 36 Three days before trial, Mr. Pratarelli tried once more, filing a second amended motion to continue trial. This motion largely reiterated details that he had already presented.

¶ 37 At trial, the court denied the second amended motion for the same reasons it denied the others.

## B. The Continuance

¶ 38 Mr. Pratarelli first contends the court abused its discretion by denying his "motions for a continuance to investigate his mental condition and determine whether to pursue a mental condition defense." We disagree.

¶ 39 We will not disturb a district court's denial of a continuance in the absence of an abuse of discretion. *People v. Ahuero*, 2017 CO 90, ¶ 11. A court abuses its discretion only if the denial "was arbitrary or unreasonable and materially prejudiced the defendant."

*People v. Brown,* 2014 CO 25, ¶¶ 19-20 (citation omitted). A defendant must demonstrate actual prejudice arising from the denial of a continuance. *People v. Cook,* 2014 COA 33, ¶ 60.

¶ 40 The record shows that defense counsel had time to investigate a mental condition defense. First, even before the journal was disclosed, defense counsel knew that law enforcement had reported that Mr. Pratarelli was "incoherent" when he crossed the border, resulting in his hospitalization. Second, after reviewing the journal, Mr. Pratarelli's counsel asked for a continuance specifically because the journal "rais[ed] some issues concerning mental-health questions," and counsel represented that he was "exploring" those issues at that time. And the district court granted that continuance, giving Mr. Pratarelli's counsel an additional four months to investigate Mr. Pratarelli's mental condition before the rescheduled trial date. Third, at most, the MRI showed possible future cognitive decline. Even armed with that information, Mr. Pratarelli presented nothing in his second (or later) requests for continuances about any possible cognitive issues at the time of the charged events. Nor did he present any medical opinion that

further testing might reveal such evidence or that additional investigation might result in evidence beneficial to his defense.

¶ 41 Thus, Mr. Pratarelli had the opportunity to pursue and develop evidence about his mental state. Given this, we can't conclude the district court abused its discretion by denying a second continuance.

## C. The Examination

¶ 42 Mr. Pratarelli next argues the district court "should have ordered an examination of [Mr.] Pratarelli under section 16-8-106[, C.R.S. 2019]." We disagree.

¶ 43 When a defendant's mental condition is offered not to show insanity, but instead to negate a culpable mental state, "expert testimony concerning the mental condition can be admissible." *People v. Wilburn,* 2012 CO 21, ¶ 20; *see also* § 16-8-107(3)(b), C.R.S. 2019. To introduce such evidence, the defendant must notify the court and prosecution "at the time of arraignment," except that "for good cause shown" the court "shall permit" the defendant to "inform the court and prosecution of the intent to introduce such evidence" before trial. § 16-8-107(3)(b).

¶ 44　But Mr. Pratarelli never notified the court (either at the arraignment or in any of his serial motions to continue) that he *intended* to introduce "expert opinion concerning his . . . mental condition." *Id.* Instead, Mr. Pratarelli asked for additional time — beyond the four months he had already received — to continue to investigate his "cerebral small vessel disease," which, he argued, "raise[d] concerns" about his "ability to form [the requisite] mental state."

¶ 45　And we are unaware of any authority — and Mr. Pratarelli points us to none — requiring a court-ordered mental examination to allow a defendant more time to investigate a mental condition defense. Thus, the district court did not err by not ordering such an examination.

### D.　Mr. Pratarelli's Testimony

¶ 46　Without objection, the court admitted the journal into evidence. During direct examination, Mr. Pratarelli's counsel asked Mr. Pratarelli why he kept the journal. Mr. Pratarelli responded that he kept it because he had "been having a number of cognitive and memory problems." The court sustained the prosecutor's

objection. Mr. Pratarelli contends the district court erred by "restricting this testimony."

¶ 47 But even if we assume the court erred, the jury had the journal itself. And the journal repeatedly documented Mr. Pratarelli's perceived concerns with his memory and cognition. For example, with respect to his memory of the charged events, the journal included the following entries: "I have no recollection," "I don't remember," "I can't remember," "why don't I remember," "what happened to my short term memory," "so why can't I remember," "no recollection again," and "why all the blank memories."

¶ 48 With respect to his cognition, Mr. Pratarelli journaled: "I don't even know which thoughts are safe [and] which are delusions, intrusions, or fragments of grounded thinking. Why can't I tell the difference anymore?" And he asked, "why couldn't I tell right from wrong Monday night," and "where was my mind and why can't I get it back?"

¶ 49 Thus, the jury knew Mr. Pratarelli's concerns; indeed, it had them documented in his own words. Mr. Pratarelli doesn't say why his cumulative testimony repeating these concerns would have made any difference. Thus, to the extent the court erred by

restricting the testimony, the error did not substantially influence the verdict or affect the fairness of the trial. *See Hagos v. People*, 2012 CO 63, ¶ 12.

## VI.   Conclusion

¶ 50    We vacate Mr. Pratarelli's conviction and sentence for first degree kidnapping and remand the case to the district court to enter a judgment of acquittal on that count. We affirm the judgment of conviction for second degree kidnapping (relating to Mr. Pratarelli's wife), use of a stun gun, and third degree assault.

JUDGE ROMÁN and JUDGE CASEBOLT concur.