22CA1590 Peo v Thompson 11-26-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 22CA1590
Weld County District Court No. 18CR1753
Honorable Vincente G. Vigil, Judge

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Brian Edward Thompson,

Defendant-Appellant.

JUDGMENT AFFIRMED

Division IV
Opinion by JUDGE SCHOCK
Harris and Johnson, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 26, 2025

Philip J. Weiser, Attorney General, Josiah Beamish, Assistant Attorney
General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Joseph P. Hough, Deputy State
Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1      Defendant, Brian Edward Thompson, appeals his conviction for sexual assault on a child by one in a position of trust. He argues that the evidence was insufficient to support his conviction and that the district court erred by allowing improper impeachment of his expert witness and by excluding evidence of his exculpatory statements to police under the rule of completeness. We affirm.

## I.      Background

¶ 2      D.R., then sixteen years old, went to Thompson's apartment one evening for a sleepover with his daughter. Initially, the two girls watched a movie with Thompson in the living room. When Thompson went to bed a few hours later, the girls stayed up. At some point, Thompson's daughter went to bed in Thompson's bed (where she normally slept),[1] and D.R. fell asleep on the couch.

¶ 3      Early the next morning, D.R. woke up and got into bed with Thompson and his daughter — lying between the two of them with a blanket between herself and Thompson — where she fell asleep. According to D.R., she later woke up and felt Thompson's fingers

---

[1] The apartment had two bedrooms. Thompson shared a room with his daughter, while his two sons shared the other room.

inside her vagina.[2]  Thompson removed his hand and it sounded like he put it in his mouth.  He then put his hand in D.R.'s pants again, but D.R. moved away, and Thompson moved his hand.

¶ 4     At that point, D.R. opened her eyes and realized she was closer to Thompson than when she fell asleep and the two were now under the blanket she had originally placed between them.  When D.R. opened her eyes, Thompson rolled away from her and acted as if he was sleeping.  D.R. got out of the bed and left the apartment.

¶ 5     As she was leaving, Thompson messaged her on Facebook, asking what happened and if she was okay.  D.R. told Thompson to leave her alone and that she was going to tell her grandma and her mom what happened.  Thompson responded that he was asleep and "when [he] woke up [she] was gone."  He said that they "all" loved her and that he was "truly sorry for whatever [he] did," adding, "If I hurt you in any way th[e]n I deserve whatever happens to me."

¶ 6     D.R. reported the assault to police and Thompson was charged with sexual assault of a physically helpless victim and sexual assault on a child by one in a position of trust.  Thompson's defense

---

[2] This account of the charged assault is based on D.R.'s forensic interview, which was admitted as an exhibit at trial.

at trial was that the incident had not happened and that D.R. had dreamed or imagined it due, in part, to her use of drugs and alcohol.  A jury convicted Thompson of sexual assault on a child by one in a position of trust and acquitted him of the other charge.

## II.     Sufficiency of the Evidence

¶ 7     We first address Thompson's argument that the evidence was insufficient to support his conviction.  He contends that the prosecution failed to present sufficient evidence that he was in a "position of trust" with respect to D.R.  We disagree.

### A.     Standard of Review and Applicable Law

¶ 8     In reviewing the sufficiency of the evidence, we review the record de novo to determine whether the evidence was sufficient both in quantity and quality to sustain the conviction.  *Johnson v. People*, 2023 CO 7, ¶ 13.  We do not "serve as a thirteenth juror and consider whether [we] might have reached a different conclusion." *People v. Harrison*, 2020 CO 57, ¶ 33.  Instead, we view the evidence as a whole and in the light most favorable to the prosecution to determine if it is "substantial and sufficient to support a conclusion by a reasonable mind that the defendant is guilty of the charge beyond a reasonable doubt."  *Johnson*, ¶ 13 (citation omitted).

¶ 9    A person commits sexual assault on a child by one in a position of trust when that person "knowingly subjects another not his or her spouse to any sexual contact . . . if the victim is a child less than eighteen years of age and the actor committing the offense is one in a position of trust with respect to the victim." § 18-3-405.3(1), C.R.S. 2025. One in a "position of trust"

> includes, but is not limited to, any person who is a parent or acting in the place of a parent and charged with any of a parent's rights, duties, or responsibilities concerning a child, including a guardian or someone otherwise responsible for the general supervision of a child's welfare, or *a person who is charged with any duty or responsibility for the health, education, welfare, or supervision of a child*, including foster care, child care, family care, or institutional care, either independently or through another, *no matter how brief*, at the time of an unlawful act.

§ 18-3-401(3.5), C.R.S. 2025 (emphasis added).

¶ 10    This definition is "broad" and the listed categories of relationships are "illustrative" and nonexclusive. *Pellman v. People*, 252 P.3d 1122, 1125 (Colo. 2011). The statute is intended to encompass "those offenders who are entrusted with special access to a child victim and who exploit that access to commit an offense against the child." *People v. Roggow*, 2013 CO 70, ¶ 15. The

4

person need not be "expressly charged with a particular duty or responsibility." *Id.* Rather, such a responsibility can be implied from the circumstances. *Manjarrez v. People*, 2020 CO 53, ¶ 26.

### B. Analysis

¶ 11 Viewed in the light most favorable to the prosecution, the evidence was sufficient to support a jury finding that while D.R. was spending the night in Thompson's home, Thompson had a duty or responsibility for her supervision. *See Pellman*, 252 P.3d at 1126.

¶ 12 Thompson was the only parent in the home and the only adult over the age of twenty.[3] He knew D.R. was staying overnight, even spending part of the evening with the girls watching a movie before going to bed. A jury could reasonably infer that by allowing another child to spend the night in his home, Thompson assumed a responsibility for her care and supervision while she was there. *See People v. Madril*, 746 P.2d 1329, 1336 (Colo. 1987) (holding that "position of trust" includes a person "who permits a young child to come into his home to spend the night with his own children").

---

[3] Thompson's twenty-year-old son was also in the home.

¶ 13    Moreover, there was also evidence that Thompson had a relationship with D.R.'s mother and that D.R.'s mother trusted him with D.R.  D.R.'s mother testified that she had known Thompson for more than twenty years and considered him to be one of her closest friends, like a "brother" to her.  She relied on Thompson to take D.R. to school and knew that D.R. occasionally spent the night with Thompson's daughter at Thompson's home.  She also testified that Thompson was "like a[n] uncle" to D.R. and was "somebody she trusted."  Although D.R.'s mother was not D.R.'s legal guardian at the time, she "worked it out with" D.R.'s grandmother (who was D.R.'s legal guardian) that "she could trust [Thompson] with [D.R.]."

¶ 14    A jury could reasonably infer from these circumstances that Thompson had "special access" to D.R. — and thus an implied duty of responsibility for her supervision during those periods of special access — by virtue of his relationship with D.R.'s family.  *See Manjarrez*, ¶ 34 (holding that the defendant "was entrusted with special access to the victim" where he "frequently socialized" with her family and they "trusted him to be alone with their daughter"); *Roggow*, ¶¶ 31-32 (holding that evidence was sufficient to establish

a position of trust where the victim's father "trusted [the defendant] with his children" and the children considered him a family friend).

¶ 15    Thompson contends that he was not in a position of trust with D.R. because, at sixteen, she was "capable of doing [some] things . . . for herself" and his interaction with her that night was limited. But while an older teenager may require less supervision than a younger child, D.R. was still a minor staying overnight in Thompson's home.  A jury could reasonably infer that, as a result, Thompson was charged with some supervisory responsibility over her — even if he was not "performing a specific supervisory task at the time." *Pellman*, 252 P.3d at 1126.  And regardless of the degree of supervision Thompson exercised, D.R.'s age had no bearing on whether the circumstances gave Thompson special access to her. *See id.* (holding that defendant was in a position of trust where victim was fifteen and met him without her parents' knowledge).

¶ 16    We therefore conclude that the evidence was sufficient to show that Thompson occupied a position of trust with respect to D.R. while she was an overnight guest of his daughter in his home.

## III.    Expert Cross-Examination

¶ 17    Thompson next argues that the district court reversibly erred by allowing the prosecution to cross-examine the defense expert with a judicial order and a Texas state commission report rejecting the expert's opinions in another case.  He contends that the order and report were hearsay, inadmissible evidence of specific instances of conduct, irrelevant, and unduly prejudicial.  We are not persuaded.  Even assuming the court erred by allowing this cross-examination, we conclude that any error was harmless or not plain.

### A.    Additional Background

¶ 18    The prosecution's DNA expert testified that Thompson's DNA was found on D.R.'s underwear but not on her vaginal or external genitalia swabs.  The defense's DNA expert, Dr. Phillip Danielson, generally agreed, testifying that (1) Thompson could not be excluded as the contributor of the male DNA on the underwear and (2) the vaginal and external genitalia swabs were "not interpretable."  But he opined that the vaginal and external genitalia swabs did "not support the proposition of digital penetration" by Thompson.

¶ 19    On cross-examination, the prosecutor asked Dr. Danielson if his testimony had been "formally discredited by a federal judge in

Washington, D.C. previously." In response, Dr. Daniel explained that he had previously provided expert testimony in a case in Washington, D.C., that a private laboratory had "employed rigorous scientific methods" and that the judge in that case said he "would not credit [that] testimony." Dr. Danielson also noted that an audit of the laboratory had later confirmed Dr. Danielson's conclusions. Over a hearsay objection, the prosecutor then quoted the prior court's ruling that "[t]he [c]ourt discredits Dr. Danielson's assertion." Dr. Danielson reiterated that the ruling addressed only the scientific validity of the methods used by the particular lab.

¶ 20 The prosecutor then asked Dr. Danielson about a report by the Texas Forensic Science Commission regarding his testimony in that case. Defense counsel objected on the ground that the report itself said it should not be used as evidence, and the district court overruled the objection. The prosecutor then quoted a passage from that report, which concluded, "Dr. Danielson also testified that he was able to distinguish between major and minor split peaks in the data. . . . The subject matter experts on the review team have also never heard of these concepts and do not agree with Dr. Danielson's views." Dr. Danielson acknowledged that is what the report said.

¶ 21 On re-direct, Dr. Danielson testified that (1) the judicial order was nearly ten years old; (2) his opinions in that case had since been confirmed in peer-reviewed publications; (3) most labs in the United States had since adjusted their standards in accordance with his testimony; and (4) the issues that were addressed in the prior case were unrelated to the opinions he offered in this case.

## B. Standard of Review and Preservation

¶ 22 We review a district court's evidentiary rulings for an abuse of discretion. *People v. McLaughlin*, 2023 CO 38, ¶ 22. A district court abuses its discretion when it misapplies the law or when its ruling is manifestly arbitrary, unreasonable, or unfair. *Id.*

¶ 23 Thompson objected to the questions at issue on only two grounds: (1) the order was hearsay, and (2) the report said it should not be used as evidence (an argument Thompson does not raise on appeal). He did not raise any other objection, including that the order and report were inadmissible specific-instance evidence under CRE 608(b), irrelevant, or unfairly prejudicial under CRE 403. *See Martinez v. People*, 2015 CO 16, ¶ 14 (noting that objections must be "specific enough to draw the trial court's attention to the asserted error"). Thus, we review these other arguments for plain

error, meaning we will reverse only if the error is "obvious" and "so undermined the fundamental fairness of the trial itself as to cast serious doubt on the reliability of the judgment of conviction." *People v. Crabtree*, 2024 CO 40M, ¶¶ 42-43 (citation omitted).

### C. Analysis

¶ 24 We first conclude that the district court did not abuse its discretion by overruling Thompson's hearsay objection to the prior judicial order. Although the prosecution did not specify the purpose of the questions, it appears they were designed not to prove the truth of the matter asserted — that Dr. Danielson's opinions in the prior case were wrong or unsupported — but to challenge his credibility by showing that a judge had so found. *See People v. Van Meter*, 2018 COA 13, ¶ 64 ("If an out-of-court statement is not offered for its truth, it is admissible as nonhearsay evidence as long as it is relevant."). To the extent certain questions went beyond this purpose, any error would be harmless for the reasons below.

¶ 25 Nor were the questions impermissible under CRE 608(b). That rule prohibits the introduction of extrinsic evidence to prove specific instances of a witness's conduct for the purpose of attacking the witness's character for truthfulness. CRE 608(b). But even

11

assuming the order and report could be considered specific instances of Dr. Danielson's conduct and even assuming they were offered to attack Dr. Danielson's *truthfulness* — as opposed to his competency — they were not proved by extrinsic evidence. The order and report were not themselves admitted into evidence. Instead, the prosecution "inquired into [them] on cross-examination" (albeit, by reading excerpts), as CRE 608(b) expressly allows. *See People v. Caldwell*, 43 P.3d 663, 670 (Colo. App. 2001).

¶ 26 We tend to agree with Thompson, however, that the relevance of the judicial order and commission report was a stretch. It is true that a witness's credibility — particularly an *expert* witness's credibility — is always relevant. *See Margerum v. People*, 2019 CO 100, ¶ 12; *see also Ross v. Colo. Nat'l Bank of Denv.*, 463 P.2d 882, 887 (Colo. 1969) ("[O]nce a witness testifies as an expert, he subjects himself to the most rigid kind of cross-examination . . . ."). And other courts have allowed the use of prior judicial credibility determinations for cross-examination. *See, e.g.*, *United States v. Woodard*, 699 F.3d 1188, 1195-96 (10th Cir. 2012) (citing cases); *United States v. Cedeno*, 644 F.3d 79, 82-83 (2d Cir. 2011); *cf. Hock v. N.Y. Life Ins. Co.*, 876 P.2d 1242, 1257 (Colo. 1994) (holding that

district court correctly permitted cross-examination of expert regarding civil suit challenging reliability of procedures at issue).

¶ 27    But according to Dr. Danielson, his only opinion that was "discredited" in the prior case was that a particular lab (not the lab in this case) had employed rigorous scientific methods (not the methods at issue in this case). That issue had nothing to do with his opinions in this case. Moreover, Dr. Danielson explained that the prior testimony was in 2013 and 2014, and that the scientific consensus had developed substantially since then. That Dr. Danielson was "discredited" nearly a decade ago somewhere by someone about something had little to do with his credibility in this case. *See Locke v. Vanderark*, 843 P.2d 27, 31 (Colo. App. 1992) (holding that district court erred by permitting cross-examination of expert about medical malpractice suits involving different medical procedures); *Woodard*, 699 F.3d at 1195 (listing factors relevant to admissibility of prior credibility determinations, including similarity of subject matter, how much time has elapsed, and whether the finding was limited to the witness's veracity in that specific case).

¶ 28    Nevertheless, even assuming the district court obviously erred by allowing this line of cross-examination, any error did not

substantially undermine the fairness of trial or cast serious doubt on the reliability of Thompson's conviction — and any preserved error would be harmless for the same reasons. First, given the lack of any apparent connection between Dr. Danielson's opinion in the prior case and his opinions in this case, we see little likelihood that the jury discounted his testimony because of the unrelated judicial order and commission report. In other words, for the same reasons the order and report were of minimal relevance, they likely had little bearing on the jury's assessment of Dr. Danielson's testimony.

¶ 29 Second, Dr. Danielson did not testify that Thompson did not digitally penetrate D.R. He opined only that the evidence — specifically, the absence of Thompson's DNA on the vaginal and external genitalia swabs — did not support the proposition that he did. But the prosecution's expert effectively acknowledged the same thing, recognizing that she could not draw any conclusions from the vaginal and external genitalia swabs. The prosecution's expert also testified about indirect DNA transfer and conceded that she could not determine how Thompson's DNA ended up on D.R.'s underwear. Thus, even if the jury discounted Dr. Danielson's testimony to some degree, the two most critical aspects of that testimony were

corroborated by the prosecution's own expert.  *Cf. People v. Pratarelli*, 2020 COA 33, ¶ 49 (holding that exclusion of testimony was not plain error where it was cumulative of other evidence).

¶ 30    Third, and most significantly, the crime for which Thompson was convicted did not require penetration.  Unlike sexual assault on a helpless victim, which requires "sexual intrusion or sexual penetration," § 18-3-402(1), C.R.S. 2025, sexual assault on a child by one in a position of trust requires only "sexual contact," § 18-3-405.3(1).  "Sexual contact" includes, among other things, "the knowing touching of *the clothing covering the immediate area of the victim's . . . intimate parts.*" § 18-3-401(4)(a) (emphasis added).  Dr. Danielson's testimony that there was no evidence of *penetration* was therefore immaterial to the jury's finding that there was *sexual contact*, particularly in light of Dr. Danielson's agreement that Thompson was a match for the DNA on D.R.'s underwear.[4]

---

[4] This does not mean, as the People argue, that the jury necessarily found there was *no* penetration.  It just means it doesn't matter for purposes of the offense for which Thompson was convicted.

¶ 31 Thus, even if the district court erred by allowing the prosecution to cross-examine Dr. Danielson about the prior judicial order and commission report, any error does not require reversal.

## IV. Rule of Completeness

¶ 32 Thompson next argues that the district court erred by denying his request to introduce exculpatory statements he made during a police interview under the rule of completeness. We disagree.

### A. Additional Background

¶ 33 During the direct examination of the lead detective, the prosecutor asked the detective if she had interviewed Thompson. When she said she had, the prosecutor asked if she "ask[ed] anything about whether [Thompson] knew what the allegation was or anything about that specific night." The detective responded:

> Yes. So when he entered the interview room, I asked him if he was aware of what the allegation was and he began talking about the messages that we have previously discussed in here, the — Facebook messages, and — talking about how he ha[d] woken up, realizing [D.R.] was gone, and he reached out to her.

The detective did not say anything more about the interview, and the prosecution did not play the video of the interview for the jury.

16

¶ 34    Defense counsel sought to elicit two additional points about the interview on cross-examination: (1) that Thompson had told the detective that he thought he was there because D.R. and his daughter had used drugs and alcohol; and (2) that Thompson never admitted to sexually assaulting D.R.  Defense counsel argued that, under the rule of completeness, it would be misleading for the jury to hear that Thompson acknowledged the Facebook messages without also hearing these other two points.  The district court sustained the prosecution's objection on the ground that the additional statements did not relate to the Facebook messages.

¶ 35    Defense counsel renewed her request on the next day of trial.  She argued that the detective's testimony had implied that Thompson knew D.R. had accused him of sexual assault and did not deny it, and that Thompson should be able to introduce his statements that he thought the interview was about something else.  The prosecutor again objected, arguing that (1) the statements the defense wanted to introduce were unrelated to the statements about the Facebook messages, having occurred several minutes later in the interview; and (2) the detective never testified that Thompson said he knew the interview had to do with an alleged sexual assault.

17

¶ 36 The court stuck with its prior ruling. It concluded that the additional statements were not necessary to provide context because the detective had not referred to any statements about sexual assault allegations. And it explained that, to the extent the Facebook messages could imply an awareness of such allegations, the jury had the necessary context from the messages themselves.

### B. Applicable Law and Standard of Review

¶ 37 The rule of completeness provides that "[w]hen a writing or recorded statement or part thereof is introduced by a party, an adverse party may require him at that time to introduce any other part or any other writing or recorded statement which ought in fairness to be considered contemporaneously with it." CRE 106 (2022)[5]; *see People v. Montoya*, 2024 CO 20, ¶ 48. The touchstone of the rule is fairness. *McLaughlin*, ¶ 31. Its purpose is to prevent a party from misleading the jury by selectively introducing portions of

---

[5] CRE 106 was amended after Thompson's trial to remove the requirement that the statement be written or recorded. *See People v. Montoya*, 2024 CO 20, ¶ 48 n.2. We cite the version of the rule in effect at the time of Thompson's trial. *See id.* In any event, a division of this court has held that the prior version applied to oral testimony as well. *See People v. Short*, 2018 COA 47, ¶ 50.

a statement while omitting other portions of the statement that are necessary to clarify or explain the part introduced. *Id.* at ¶ 24.

¶ 38   The district court exercises broad discretion in determining whether fairness requires admission of additional statements under the rule of completeness. *Montoya,* ¶ 57. We review the exclusion of such statements for an abuse of discretion, which occurs only when the district court misapplies the law or when its ruling is manifestly arbitrary, unreasonable, or unfair. *McLaughlin,* ¶ 22.

### C.   Analysis

¶ 39   The detective did not testify to any specific statements that Thompson made during the interview. Instead, the entirety of her testimony on this point was that Thompson "began talking about the [Facebook] messages" and "about how he [woke] up, realiz[ed] [D.R.] was gone, and . . . reached out to her" — effectively, the same thing Thompson said in the Facebook messages. Assuming this limited testimony constitutes the introduction of a part of the interview, the district court did not abuse its discretion by concluding that fairness did not require admission of Thompson's other statements because those statements were not necessary to complete or clarify his earlier statements. *See Montoya,* ¶ 57.

¶ 40    The general statements the detective described were not inconsistent with Thompson's later statements.  *Cf. id.* at ¶ 34 (addressing admission of refusal to take blood test and omission of request to take test); *People v. Short*, 2018 COA 47, ¶ 34 (addressing admission of statement that "someone's abusing [the victim]" and omission of statement, "[B]ut it ain't me").  The detective did not testify that Thompson said he knew he had been accused of sexual assault, much less that he admitted to (or failed to deny) a sexual assault.  At most, the statements implied that Thompson knew he was accused of doing *something* on the night in question.  But Thompson's later statement that he thought he was there because the girls used drugs and alcohol that night did not indicate otherwise.  *See Short*, ¶ 39 (noting that rule of completeness does not apply to portions of the statement that are irrelevant to the part that was introduced).  To the extent the Facebook messages implied Thompson's awareness of a sexual assault, that implication came from the messages themselves and not the detective's testimony.

¶ 41    Moreover, Thompson's later statements did not provide context to the introductory statements the detective described.  In *McLaughlin* and *Short*, the prosecution selectively redacted portions

of the *same* statement that was introduced. *See McLaughlin,* ¶¶ 10–12 (describing redactions of individual sentences, and even parts of sentences, from otherwise complete back-and-forth exchange); *Short,* ¶ 34 & n.1 (noting that omitted statement was made immediately after admitted statement, but distinguishing statement made sixteen seconds later in response to different accusation). And in *Montoya,* the prosecution played an eight-minute video that ended with the inculpatory statement while omitting the defendant's later statement recanting it. *See Montoya,* ¶¶ 55-58.

¶ 42    Nothing similar happened here. The statements Thompson sought to introduce — which came several minutes later in the interview — had nothing to do with the Facebook messages or what he had done when he woke up on the morning of the charged assault. *See id.* at ¶ 57 (noting that the passage of time between the statements "should inform the court's assessment of what is fair"). And unlike in *Montoya,* no reasonable juror would have understood the detective's general description of Thompson's reference to the Facebook messages to be a full account of everything Thompson had said in the interview. Nor did Thompson's subsequent statements contradict or retract the

21

admitted ones. *See id.* at ¶ 56. Indeed, the detective's testimony added little, if anything, to the Facebook messages themselves.

¶ 43 Under these circumstances, the district court did not abuse its discretion by determining that the detective's brief testimony about how Thompson began his police interview was not misleading so as to, in fairness, require the admission of the purportedly exculpatory statements Thompson made later in the same interview.

## V. Disposition

¶ 44 The judgment is affirmed.

JUDGE HARRIS and JUDGE JOHNSON concur.