23CA1930 Peo v Kane 12-24-2025

COLORADO COURT OF APPEALS

---

Court of Appeals No. 23CA1930
El Paso County District Court No. 22CR5049
Honorable William H. Moller, Judge

---

The People of the State of Colorado,

Plaintiff-Appellee,

v.

Robert Eugene Kane,

Defendant-Appellant.

---

JUDGMENT AFFIRMED

Division II
Opinion by JUDGE MEIRINK
Fox and Brown, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced December 24, 2025

---

Philip J. Weiser, Attorney General, Jaycey DeHoyos, Assistant Attorney General, Denver, Colorado, for Plaintiff-Appellee

Megan A. Ring, Colorado State Public Defender, Lisa Weisz, Deputy State Public Defender, Denver, Colorado, for Defendant-Appellant

¶ 1    A jury convicted defendant, Robert Eugene Kane, of sexual assault on a child by one in a position of trust.  He appeals, and we affirm.

## I.    Background

¶ 2    During the summer of 2021, E.M. developed a friendship with Kane's daughter and spent four to seven nights a week at Kane's house.  Because E.M. was fifteen and couldn't drive, Kane often picked her up and drove her to his house when she visited.  E.M. often referred to Kane as "dad," and he texted her daily.

¶ 3    In July 2021, E.M. visited Kane's home.  E.M., Kane, Kane's wife, and Kane's daughter were playing a Wii bowling game.  E.M. bent over to play with the family's dog, and Kane struck the lower part of her buttocks twice with an open hand.  Kane's daughter was standing a few feet away and heard but did not see the swat.  Kane's wife was also a few feet away and saw the incident.  E.M. testified that the swat hurt and that when she turned around to see Kane's reaction, he was laughing.  E.M. testified that Kane told her that she was "asking for it."

¶ 4    E.M. testified that she did not initially think the strike was sexual.  However, a few months later, Kane sent E.M. the following text:

> Good morning.  I hope you can make it [because] this is the weekend I was going to smoke with you guys.  I don't know how you feel about this, but I'm going to say it and I hope you don't hate me for it.  I hope someday I can see you in my favorite outfit and give you a tongue lashing to remember.  There, it's off my chest.  I won't mention anything about it again unless you want me to.  Have a great day.

¶ 5    E.M. then believed the swat was sexual in nature.  She reported the swat to police two days after receiving Kane's text.  The police interviewed Kane, who claimed that the swat was not sexual, and the text reference to "tongue lashing" had many different meanings (like yelling at somebody).  Kane was charged with sexual assault on a child by one in a position of trust in violation of section 18-3-405.3(1), C.R.S. 2025.

¶ 6    Kane argued at trial that he struck E.M.'s buttocks in a joking manner.  The jury found him guilty, and the court sentenced him to ninety days in jail and an indeterminate sentence of ten years to life of sex offender intensive supervision probation.

## II.    Analysis

¶ 7    Kane raises multiple arguments on appeal.  He argues that (1) he was denied the right (a) to be present, (b) to counsel, and (c) to due process when the judge addressed the jury during deliberations without him and his attorney; (2) the prosecution failed to prove beyond a reasonable doubt that Kane was in a position of trust or that the buttocks swat had a sexual purpose; (3) the text messages exchanged between Kane and E.M. were extrinsic CRE 404(b) evidence, and the admission of that evidence without a CRE 404(b) analysis or a limiting instruction requires reversal; (4) the lead detective improperly testified that the charges were supported by probable cause and the defense witnesses were biased; and (5) cumulative error requires reversal.  We disagree with Kane's contentions and address each in turn.

### A.    Kane Was Not Denied His Right to Be Present, to Counsel, or to Due Process During the Challenged Exchange Between the Judge and the Jury

¶ 8    Kane argues that the trial court reversibly erred by depriving him of his right to be present, his right to counsel, and his right to due process when it addressed a "question" from the jury during deliberations.  We disagree.

## 1.    Additional Facts

¶ 9    Closing arguments occurred on a Friday afternoon.  The jury didn't reach a verdict that day, and they were instructed to return on Monday morning at 10:30 a.m.  On Monday morning, a juror called the court to relay that she was delayed because of a medical appointment.  The court held a short conference with counsel to discuss scheduling.  Counsel and the court agreed that when the jury arrived, the court would instruct them that they were not needed until 1 p.m.  The court asked counsel if they wanted to be present for that discussion with the jury.  Defense counsel declined, saying,

> I'm upstairs doing a felony plea here pretty quickly so I'm ok, Judge, if you just instruct them.  I trust that, obviously, potentially there will be a record, but I don't need to be there in person.

The prosecutor also agreed that she did not need to be present. Defense counsel said he would tell Kane to return to court at 1 p.m.

¶ 10    The court brought the jurors into the courtroom and explained that they weren't needed until that afternoon. One of the jurors then said the following:

JUROR: When we were waiting to come in, the Defendant's wife came — and that —

THE COURT: Yes, I heard about that.

JUROR: Ok.

THE COURT: And so I'm going to go ahead and address that with Defense Counsel —

JUROR: Ok.

THE COURT: — and [the prosecution].

JUROR: Ok. We didn't say anything back. We were just —

THE COURT: No, no, no. I — I'm just going to tell you that that was what I would consider an inappropriate communication. So, I do appreciate it if that happens again, please let me know and I'll take whatever additional action. I think she probably thought she was doing a — everybody a favor —

JUROR: Yeah.

THE COURT: But unfortunately, that isn't appropriate. Alright, any other questions I can ask — or any answer for any of you.

¶ 11    The jury was dismissed to reconvene that afternoon.

### 2.    Right to Be Present

¶ 12    A defendant has a right to be present at every critical stage of their criminal trial. *People v. Cardenas*, 2015 COA 94M, ¶ 21. Stages of criminal proceedings have been deemed "critical" when

5

there exists more than a "minimal risk" that the absence of the defendant's counsel might impair the defendant's right to a fair trial. *People v. Wright*, 2021 COA 106, ¶ 37 (quoting *Key v. People*, 865 P.2d 822, 825 (Colo. 1994)). A court's discussion with the jurors can be a critical stage in a criminal proceeding. *People v. Guzman-Rincon*, 2015 COA 166M, ¶ 20. But "the right to be present is not constitutionally guaranteed when the defendant's presence would be useless or when the benefit of the defendant's presence would be 'but a shadow.'" *Zoll v. People*, 2018 CO 70, ¶ 20 (quoting *Kentucky v. Stincer*, 482 U.S. 730, 745 (1987)). "Whether a trial court violated a defendant's right to be present is a constitutional question that [we review] de novo." *Id.* at ¶ 15 (citation omitted).

¶ 13    The court did not violate Kane's right to be present because his presence during the court's exchange with the jury would have been useless. *See Zoll*, ¶ 20. Our review of the record doesn't indicate that Kane's presence during the exchange was necessary to safeguard the proceeding's fairness, and Kane hasn't explained what he could have offered, beyond speculating that he might have known something about the encounter because his wife was

involved. The court addressed the jury to let it know of a delay, and the court's response to the juror's comment about encountering Kane's wife was appropriate and unrelated to the issues the jury was to decide. *See id.* ("A defendant has the right to be present 'whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge.'" (quoting *Stincer*, 482 U.S. at 745). Under these circumstances, Kane's presence would have had no practical effect on the proceeding, and his right to be present was not violated.

### 3. Right to Counsel

¶ 14 The State contends that defense counsel waived his right to be present when the court addressed the jury. Rights can be waived, but a waiver of a fundamental right such as a right to counsel requires a knowing, voluntary, and intelligent waiver by the accused. *Phillips v. People*, 2019 CO 72, ¶ 16 n.3. Because defense counsel could not waive Kane's right to counsel on Kane's behalf, and Kane's absence from the proceeding prevented him from waiving his right to counsel, this argument was not waived. Accordingly, we will review it.

### a. Standard of Review and Applicable Law

¶ 15    Both the United States and Colorado Constitutions guarantee a defendant the right to counsel "at every critical stage of a criminal proceeding." *Key*, 865 P.2d at 825; *see* U.S. Const. amend. VI; Colo. Const. art. II, § 16.  As discussed above, a court's discussion with the jurors can be a critical stage in a criminal proceeding. *Guzman-Rincon*, ¶ 20.  "We review whether a defendant has been denied representation at a critical stage of the proceedings de novo." *Id.* at ¶ 15.

### b. Analysis

¶ 16    Kane contends that he was denied the right to counsel when the judge instructed the jury that Kane's wife — "a key defense witness" — had behaved inappropriately.  We disagree because the challenged exchange did not occur during a critical stage of the proceeding.

¶ 17    Kane relies on *Leonardo v. People*, 728 P.2d 1252 (Colo. 1986), and *Key*, which held that the ex parte communications between the judge and jury deprived the defendant of his constitutional right to counsel at a critical stage of the proceedings.  *Leonardo*, 728 P.2d at 1256; *Key*, 865 P.2d at 826.  As explained below, the facts of *Key*

8

and *Leonardo* are distinguishable from Kane's situation because the judge's statements in those cases occurred during a critical stage of the trial.

¶ 18     In *Leonardo*, the defendant was charged with theft by receiving, which required him to "know[] or believ[e]" that the item in question had been stolen.  728 P.2d at 1254.  During deliberations, the jury asked whether the instruction for "[k]nowing or [b]elieving" was the same as "[h]aving a [s]uspicion of."  *Id.* (emphasis omitted).  Without consulting counsel for either side, the judge told the jury it had to reach a verdict "applying the words as you find them in the instructions."  *Id.*  The jury made no further inquiries and found Leonardo guilty.  Leonardo appealed, arguing in part, that he was denied the right to counsel.

¶ 19     Because the jury's question "betrayed a serious misunderstanding regarding the culpable mental state required for the crime of theft by receiving," the supreme court concluded that it could not say that "the failure of the trial judge to obtain the presence of the defendant and his counsel and to give defense counsel the opportunity to be heard was harmless beyond a reasonable doubt."  *Id.* at 1258.

¶ 20    Unlike the exchange between the judge and jury in *Leonardo*, the exchange here didn't have the potential to influence the jury's deliberations or the outcome at trial. The jurors didn't ask a question related to the instructions, seek clarification about their meaning, or indicate to the court that they misunderstood them. The exchange neither addressed nor affected the jury's understanding of their instructions or their deliberations and carried no risk of influencing the verdict.

¶ 21    Although, here, the court informed the jury that the witness's communication was inappropriate, the exchange didn't involve any issue central to the determination of guilt or innocence. The jury reported the contact, and the court responded by reminding it that the communication — like any communication between a witness and the jury — was improper.

¶ 22    This case is also distinguishable from *Key*, when the court brought the jurors back into the courtroom during deliberations to discuss scheduling matters without informing either defense counsel or the prosecution. 865 P.2d at 823. The court mentioned the upcoming holidays and the potential for scheduling conflicts if the jury did not decide the case quickly. *Id.* at 824. This kind of

pressure presented a substantial risk to the defendant's right to a fair trial because at least two jurors who were traveling over the holidays had "substantial incentives to arrive at a verdict by the end of the first afternoon of deliberations." *Id.* at 825. Counsel's presence was essential to preserve any objections or to move for a mistrial if the proposed schedule would infringe upon the right to a fair trial. *Id.* at 825-26.

¶ 23 No similar transgression occurred here that required defense counsel's presence. The court didn't place time constraints on jury deliberations or indicate that a quick decision was expected or encouraged. Rather, the court reiterated what it had told the jury throughout the trial — that it was not to engage in or consider any outside communication and that such contact was improper.

¶ 24 Defense counsel's absence didn't impair Kane's right to a fair trial because the challenged exchange didn't occur at a critical stage of the proceedings. *See id.* at 825 ("Not every communication between the judge and jury constitutes a critical stage of the trial."). We, therefore, do not think the court erred by reminding the jury, even outside of defense counsel's presence, that being approached by a witness was improper.

¶ 25 Finally, the parties dispute whether a violation of the right to counsel amounts to structural error requiring automatic reversal, *see People v. Lopez*, 2024 CO 50, ¶ 45, or whether constitutional harmless error applies, *see Key*, 865 P.2d at 826. Having concluded that Kane's right to counsel was not violated and that the court did not err, we need not decide the applicable standard of reversal.

## 4. Right to Due Process

¶ 26 Kane's due process argument simply restates his claims that his right to be present and his right to counsel were violated. Kane asserts that the court's comment cast his wife, the "sole eyewitness to the charged incident," in a negative light and prejudiced the defense. But Kane doesn't develop an independent due process argument; he simply argues that had he or counsel been present, an objection could have been made. Because we have already concluded that no reversible error occurred when Kane and his counsel were not present during the court's discussion with the jurors, we similarly discern no due process violation.

## B. There was Sufficient Evidence for the Jury to Conclude that Kane Was in a Position of Trust and Subjected E.M. to Sexual Contact

¶ 27     Kane argues that the prosecution failed to prove beyond a reasonable doubt that he was in a position of trust or that the buttocks swat had a sexual purpose.  We disagree.

### 1. Standard of Review and Applicable Law

¶ 28     We review questions of statutory interpretation de novo. *People v. Roggow*, 2013 CO 70, ¶ 12.  In construing the statutory definition of "position of trust," we seek to effectuate the General Assembly's intent.  *Id.*  We begin with the plain language of the statute, reading the words and phrases in context and construing them according to their common usage.  *Manjarrez v. People*, 2020 CO 53, ¶ 19.  If the statutory language is clear and unambiguous, we apply it as written without resorting to other means of discerning legislative intent.  *Roggow*, ¶ 12.

¶ 29     We review the sufficiency of the evidence de novo.  *Id.* at ¶ 13. "In so doing, we must determine whether the relevant evidence, when viewed as a whole in the light most favorable to the prosecution, is sufficient to support a conclusion by a reasonable

mind that the defendant is guilty of the charges beyond a reasonable doubt." *Id.*

¶ 30    A person commits sexual assault on a child by one in a position of trust when he "knowingly subjects another not his or her spouse to any sexual contact. . . if the victim is a child less than eighteen years of age and the actor committing the offense is one in a position of trust with respect to the victim." § 18-3-405.3(1). "Sexual contact" means

> the knowing touching of the victim's intimate parts by the actor, or of the actor's intimate parts by the victim, or the knowing touching of the clothing covering the immediate area of the victim's or actor's intimate parts if that sexual contact is for the purposes of sexual arousal, gratification, or abuse.

§ 18-3-401(4)(a), C.R.S. 2025.  "Intimate parts" includes "the buttocks" of any person.  § 18-3-401(2).

¶ 31    The definition of "position of trust" adopted by the legislature "is a broad one." *Pellman v. People*, 252 P.3d 1122, 1125 (Colo. 2011).  Section 18-3-401(3.5) provides:

> One in a "position of trust" includes, but is not limited to, any person who is a parent or acting in the place of a parent and charged with any of a parent's rights, duties, or responsibilities concerning a child, including a

14

> guardian or someone otherwise responsible for
> the general supervision of a child's welfare, or
> a person who is charged with any duty or
> responsibility for the health, education,
> welfare, or supervision of a child, including
> foster care, child care, family care, or
> institutional care, either independently or
> through another, no matter how brief, at the
> time of an unlawful act.

The Colorado Supreme Court observed in *Roggow* that this definition expressly includes two categories of persons. The first category encompasses "parents and persons who regularly watch over and care for a child, such as grandparents, other relatives, close friends, or a parent's [partner]." *Roggow*, ¶ 18. The second category encompasses persons who "generally have access to the child only for limited periods of time." *Id.* at ¶ 19. However, the legislature's broad definition is not limited to these categories, and they instead "reflect the General Assembly's overarching intent to target those offenders who are entrusted with special access to a child victim and who exploit that access to commit an offense against the child." *Id.* at ¶ 15.

¶ 32    For purposes of the position of trust statute, "a defendant need not be expressly charged with a particular duty or responsibility over the child at the time of the unlawful act in order

to occupy a position of trust." *Id.* Instead, a duty or responsibility for the welfare or supervision of a child can be implied from the circumstances. *See People v. Madril,* 746 P.2d 1329, 1336 (Colo. 1987) (concluding there was sufficient evidence that the defendant "voluntarily assumed 'a position of trust' with respect to [the victim] when he agreed to permit her to spend the evening with his children at his home"). Accordingly, "a defendant's special access to the victim by virtue of an existing relationship or other conduct or circumstances is evidence of an implied duty or responsibility for the welfare or supervision of the victim during those periods of special access." *Manjarrez,* ¶ 27.

### 2. Analysis

#### a. Position of Trust

¶ 33    We conclude that there is sufficient evidence to support the jury's finding that Kane was in a position of trust with respect to E.M. when the alleged incident occurred. While Kane was not E.M.'s teacher, chaperone, or babysitter, E.M.'s relationship with Kane and the circumstances surrounding the days in question indicate that Kane had special access to E.M.

¶ 34 E.M. spent four to seven nights per week at Kane's home and was integrated into the family environment. She often referred to him as "dad" and expressed a desire for him and his wife to adopt her. E.M. also could not drive and depended on Kane to bring her to his house for visits. By facilitating these frequent overnight stays, Kane assumed responsibility for E.M.'s supervision, welfare, and transportation. There was thus sufficient evidence for the jury to find that Kane held a "position of trust" with respect to E.M. Kane's arguments to the contrary simply ask us to reweigh the evidence in his favor, which we cannot do. *See People v. Perez*, 2016 CO 12, ¶ 25 (in conducting a sufficiency analysis, we do not serve as a thirteenth juror or invade the province of the jury).

b. Sexual Contact

¶ 35 Kane claims that the prosecution failed to prove beyond a reasonable doubt that he swatted E.M.'s buttocks for the purposes of sexual arousal, gratification, or abuse. He argues that, at the time of the offense, E.M. did not perceive the swat as sexual in nature but rather as a "spank" — like she was in trouble for something. This argument is misplaced because it focuses on E.M.'s perception of the swat. The statute, however, does not

17

require the victim to perceive the contact as sexual in nature. Rather, it focuses on the defendant's purpose for the touch and whether the defendant did it for sexual arousal, gratification, or abuse. The statutory focus, therefore, lies on the actor's intent and not on the victim's interpretation.

¶ 36    There is no direct evidence — such as Kane's admission — of Kane's intent that he swatted E.M.'s buttocks for purposes of sexual arousal or gratification. But a defendant's intent can, and often must, be proved by circumstantial evidence. *People v. Taylor*, 655 P.2d 382, 384 (Colo. 1982) ("[W]e have repeatedly recognized that direct proof of the defendant's state of mind is rarely available and, consequently, resort must necessarily be had to circumstantial evidence on this element."); *People v. Hines*, 2021 COA 45, ¶ 37 ("A jury may properly infer intent from the defendant's conduct and the circumstances of the offense."). And whether a defendant acted with the requisite mental state to sustain a conviction for unlawful sexual contact can also be inferred from the nature of and the circumstances surrounding the sexual touching. *See People v. McCoy*, 2015 COA 76M, ¶ 47 (concluding that when the adult defendant, who claimed to be a physician, lured two victims to his

home by telling them he worked in television, questioned them about their sexual histories and sexual fantasies, and physically examined them — including touching their genitals — the jury could reasonably conclude that he examined the victims for the purpose of sexual gratification), *aff'd on other grounds*, 2019 CO 44.

¶ 37     Kane struck E.M. on her buttocks with his open hand.  E.M. was wearing tight spandex shorts at the time, and E.M. testified that Kane said she was "asking for it" because she bent over to play with the dog.  Kane's conduct before and after the swat provides context and circumstantial evidence from which the jury could reasonably infer that he acted with a sexual purpose.  Kane sent E.M. multiple text messages before the incident, asking if she thought they might "get in trouble" for texting, warning her that he was "constantly dirty minded," and calling E.M. a "sexy bitch." Kane also texted E.M. during the period in question, asking her if she thought that he was creepy, why she didn't want to be alone with him, and if she would "hang out" with him.  Kane also texted E.M. that he hoped to see her one day in his "favorite outfit" and to give her "a tongue lashing to remember."  Viewed in the light most favorable to the prosecution, this evidence would allow a reasonable

jury to find that Kane's purpose in swatting E.M.'s buttocks was sexual and that he subjected her to sexual contact. Kane's focus on contrary record evidence is unavailing. *See Perez*, ¶ 25.

## C. The Text Messages Between Kane and E.M. Were Admissible

¶ 38 Kane argues that the text messages he exchanged with E.M. were extrinsic CRE 404(b) evidence and that the court erred by admitting the messages without a CRE 404(b) analysis or a limiting instruction. We disagree.

### 1. Additional Facts

¶ 39 In a pretrial filing, defense counsel stated that "[Kane] request[ed] reasonable notice from the prosecution in advance of trial of any intent to introduce any evidence subject to CRE 404(b)." The trial court issued a case management order stating that "the defense must provide to the [P]eople any CRE 404(a)(2) evidence," but it didn't require the prosecution to file any notice under CRE 404(b). The prosecution didn't file a notice.

¶ 40 At trial, the prosecution admitted multiple texts that Kane sent E.M.:

> June 10, 2021: Are you or I going to get in any trouble for texting each other? . . . I know a lot of people don't like other parents talking to

their kids.  If I ever do or say anything that makes you uncomfortable, please tell me. . . . And just as a warning, I'm constantly dirty minded!  LOL

July 27, 2021: Have a good day, you sexy bitch!  love you!

October 28, 2021: Good morning!  I hope you can make it [because] this is the weekend I was going to smoke with you guys!  I don't know how you feel about this, but I'm going to say it and hope you don't hate me for it.  I hope someday I can see you in my favorite outfit and give you a tongue lashing to remember!  There, it's off my chest!  I won't mention anything about it again unless you want me to.  Have a great day!

¶ 41     The prosecution also admitted text messages that E.M. sent to

Kane on October 28, 2021:

> [N]o that was so f****** unnecessary, like that was beyond disgusting, and you should f****** know better.  Like at this point you have just become a predator in my f****** life.  Like why the f*** would you say that?  [I don't know] what sick fantasies you and Kat have about me but yall need to find some f****** sanity and stop trying to groom onto a 16 [year old] you are so f****** lucky I haven't told my dad about this yet.  I told Jr and youre lucky you didn't get a f****** correction to your jaw.  [Y]our little "I'm sorry" is f****** b******* man!  Or when you smacked my a** and said I was "asking for it" like you're f****** disgusting bro.
>
> . . . .

21

> [Y]ou're a predator and you need to reevaluate how you are because clearly you need some f****** help.

The defense did not object to any of these text messages at trial.

### 2. Preservation

¶ 42 Kane argues that this issue was preserved by the pretrial filing requesting notice of any CRE 404(b) evidence that was memorialized in a court order. True, a pretrial motion can preserve an objection in the absence of a contemporaneous objection, *Uptain v. Huntington Lab, Inc.*, 723 P.2d 1322, 1330 (Colo. 1986), but the prosecution didn't act contrary to a pretrial order because it wasn't required to file pretrial notice of evidence it intended to submit under CRE 404(b), Kane didn't file a pretrial objection to the evidence, and Kane didn't contemporaneously object when the evidence was introduced at trial. Therefore, the issue is unpreserved.

### 3. Standard of Review and Applicable Law

¶ 43 A trial court's decision to admit evidence under CRE 404(b) is reviewed for abuse of discretion. *People v. Cooper*, 104 P.3d 307, 309 (Colo. App. 2004). However, when the defendant does not object to the admission of evidence at trial, we review for plain

error.  *People v. Vecellio*, 2012 COA 40, ¶ 54.  "Plain error is 'an error that is obvious, substantial, and grave, seriously affecting the substantial rights of the accused.'"  *Id.* (citation omitted).  "Plain error occurs only when, after review of the entire record, the appellate court concludes that the error undermined the fundamental fairness of the trial."  *People v. Miller*, 113 P.3d 743, 745 (Colo. 2005).  To be plain, the error must be so obvious that the trial court should have been able to avoid it without an objection.  *Cardman v. People*, 2019 CO 73, ¶ 34.

¶ 44     CRE 404(b) bars the admission of evidence of "any other crime, wrong, or act" to prove "a person's character in order to show that on a particular occasion the person acted in conformity with the character."  CRE 404(b)(1).  However, other act evidence "may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."  CRE 404(b)(2).  This list is not exclusive; "courts can admit uncharged misconduct evidence for almost any non-propensity purpose," subject to the limitations discussed below.  *Rojas v. People*, 2022 CO 8, ¶ 28.

¶ 45    When "evaluating whether uncharged misconduct evidence triggers [CRE] 404(b), a trial court must first determine if the evidence is intrinsic or extrinsic to the charged offense." *Id.* at ¶ 52. Intrinsic acts are limited to "(1) those that directly prove the charged offense and (2) those that occur contemporaneously with the charged offense and facilitate the commission of it." *Id.* at ¶ 44. All other acts are extrinsic.  If proposed extrinsic act evidence suggests that the defendant has a bad character and that he acted in conformity with that bad character, it is admissible "only as provided by [CRE] 404(b) and after a [*People v. Spoto*, 795 P.2d 1314 (Colo. 1990),] analysis." *Id.* at ¶ 52.

¶ 46    Under *Spoto*, courts must consider whether (1) the evidence relates to a material fact; (2) the evidence is logically relevant; (3) the evidence is independent of the prohibited inference that the defendant has a bad character and acted in conformity with that character in this instance; and (4) the probative value of the evidence is substantially outweighed by the danger of unfair prejudice.  795 P.2d at 1318-19.

¶ 47    The trial court did not conduct a *Spoto* analysis when determining that the text messages were admissible.  However, any

24

error in admitting the evidence does not require reversal if the evidence meets the foundational CRE 404(b) and *Spoto* requirements. *See People v. Cousins*, 181 P.3d 365, 370 (Colo. App. 2007) ("A conviction will not be overturned on appeal when the trial court employed an erroneous standard in analyzing the admissibility. . . [if the] evidence [is] admissible, and the proper foundation [was] laid for its admission.").

### 4. Analysis

¶ 48　　The buttocks swat occurred on July 8, 2021.  The challenged text messages — sent on June 10, July 27, and October 28, 2021 — did not occur contemporaneously with the incident.  They do not directly prove that the swat was for sexual gratification, as they neither mention the swat nor state that Kane acted with such a purpose.  However, they provide relevant context and support an inference that Kane's underlying intent was sexual in nature.  We therefore consider whether the challenged text messages were admissible as extrinsic evidence under *Spoto*.

¶ 49　　The first and second prongs of *Spoto* are satisfied.  The text messages are material and logically relevant because they demonstrate that Kane may have been sexually interested in E.M.,

making it more likely Kane touched E.M. for purposes of sexual gratification. Kane told E.M. he was "constantly dirty minded," referred to her as a "sexy bitch," and told her he would like to give her a "tongue lashing."

¶ 50 The third *Spoto* prong is also satisfied because the text messages' logical relevance does not depend on the inference that Kane was acting according to his bad character when he touched E.M. Nothing in our review of the record indicates that the prosecution sought to introduce the text messages to prove that Kane was acting in conformity with his bad character. Instead, the prosecution used the texts to establish Kane's relationship with E.M.; his sexual interest in her; and the likelihood that because he was interested in her sexually, Kane struck E.M. for sexual gratification.

¶ 51 The final *Spoto* prong is also satisfied because the probative value of the text messages — in proving Kane's intent — substantially outweighed the danger of unfair prejudice. While the text messages are prejudicial in that they tend to demonstrate Kane's sexual interest in E.M., such prejudice is not unfair in a

child sexual assault case because Kane's sexual intent or motive toward E.M. constitutes a material element of the charged offense.

¶ 52 Even if the court erred by not requiring pretrial notice or providing a limiting instruction, any error was not substantial or obvious. The purpose of giving pretrial notice is to avoid surprise, but Kane doesn't articulate that he was surprised by the evidence — nor could he, having sent the texts — or how his defense strategy would have been different had the prosecution given pretrial notice. Likewise, although the court didn't provide a limiting instruction, it was clear that the purpose of the texts was to show Kane's intent. For example, the police reports filed with the evidentiary motions clarified that the purpose of the texts was to show Kane's intent of sexual gratification. Additionally, during closing arguments, the prosecutor clarified that the texts were being used as evidence of Kane's intent: The "question isn't whether we have proven that he is inappropriate beyond a reasonable doubt, but these help inform you on what his intent is. This is what is going on in his mind."

¶ 53 Kane also challenges the admissibility of text messages that E.M. sent in October 2021 calling him a "predator" and

"disgusting," citing CRE 404(b).  E.M.'s pejoratives are not evidence of "any other crime, wrong, or act" used to prove Kane's character, so CRE 404(b) does not exclude this evidence.  Kane fails to claim any basis other than CRE 404(b) to exclude this evidence and did not ask to redact the text messages.  Accordingly, we discern no error in admitting E.M.'s text messages.

### D. The Lead Detective Did Not Improperly Testify

¶ 54     Kane argues that the lead detective improperly testified on direct examination that the charges were supported by probable cause and that the defense witnesses were biased.  We perceive no reversible error.

### 1. Additional Facts

¶ 55     During direct examination, the detective assigned to E.M.'s case testified that he investigated the matter by contacting the victim and her parents, setting up a forensic interview, downloading the contents of the victim's phone, and speaking to Kane.  The detective also testified that he did not interview Kane's wife or daughter.  When asked why they weren't interviewed, the detective said,

I observed [E.M.'s] [forensic] interview and then spoke with [Kane]. And at that point I gathered enough information and evidence with the cell phone messages and his statements to establish probable cause. And those other involved parties were present and hadn't witnessed it or they were going to be biased witness[es] is what I call them and so I just went forward with charging.

There was no contemporaneous objection to the detective's testimony.

## 2. Standard of Review and Applicable Law

¶ 56 A trial court has broad latitude in determining the admissibility of evidence, and we review its determination for an abuse of discretion. *Davis v. People*, 2013 CO 57, ¶ 13. But because Kane did not preserve this issue by objecting contemporaneously at trial, we review it for plain error. *See Hagos v. People*, 2012 CO 63, ¶ 14.

¶ 57 In *Davis*, the supreme court held that a detective could "testify about [their] assessments of interviewee credibility when that testimony [wa]s offered to provide context for the detective's interrogation tactics and investigative decisions." *Davis*, ¶ 19. But the "admissibility of any testimony hinge[d] on the particular circumstances under which it [wa]s elicited and offered." *Id.* The

29

testimony was admitted primarily to explain the detectives' use of different interrogation techniques during interviews. *See id.* at ¶¶ 5-9. While the court emphasized the admissibility of such testimony was highly fact specific, it outlined several facts underlying its conclusion that the admitted testimony was proper, including:

> • the prosecutor did not use inflammatory or prejudicial words such as "lie";
>
> • the prosecutor used open-ended questions;
>
> • the detectives did not testify as to the credibility of the witnesses' in-court testimony, but rather to their assessment of the interviewees' credibility during the investigatory interviews;
>
> • the detectives' testimony was offered to explain their investigative decisions;
>
> • the witnesses on whose credibility the detectives opined testified at trial and were subject to cross-examination, which provided the jury ample opportunity to judge their credibility for itself; and
>
> • although the trial court did not provide a limiting instruction about each challenged portion of testimony, a limiting instruction was not required by statute or requested by either party.

*People v. Liebler*, 2022 COA 21, ¶ 44.

30

### 3. Analysis

¶ 58 Here, the detective answered the prosecutor's open-ended questions about his training, his general duties as a detective with the special victims' unit, and his process for investigating cases and interviewing witnesses. The prosecutor had asked the detective whom he had interviewed and why. The prosecutor didn't use prejudicial or inflammatory words, such as "lie," and didn't press the detective after he made the challenged statement. The detective's testimony didn't touch on the witnesses' in-court testimony. Rather, his response explained his assessment of credibility and how that helped him decide whether an interview with Kane's wife or daughter was necessary, given that he had gathered sufficient information for his investigation. Also, Kane's wife and daughter testified at trial and were subject to cross-examination, which provided the jury with "ample opportunity to judge the credibility of these witnesses for itself, independent of the detective's statements." *People v. Lopez*, 129 P.3d 1061, 1067 (Colo. App. 2005).

¶ 59 While the trial court didn't provide a limiting instruction on the detective's testimony, it had no duty to provide one sua sponte

unless required to do so by statute or requested to do so by a party. *See Davis*, ¶ 21. Neither situation applied here. We discern no error — let alone plain error — with the court's decision to admit the detective's testimony because his testimony did not undermine the trial's fairness and did not cast serious doubt on Kane's conviction.

¶ 60 Likewise, when the detective testified that he had "gathered enough information and evidence with the cellphone messages and [Kane's] statements to establish probable cause," his statements were in response to the prosecutor asking whom he had interviewed and why. He was explaining why it was unnecessary to interview Kane's wife and daughter. The detective did not explain the probable cause standard or imply that the charges were based on his assessment. Further, the statement was brief and wasn't relied on by the prosecution. *See People v. Mendenhall*, 2015 COA 107M, ¶ 69 (concluding that the trial court did not err by admitting investigator's testimony on how often charges were brought based on his referrals because his statements were "brief and constituted a small part of his testimony"). Even if the detective's statement was improper, its admission didn't amount to plain error because

any error was not obvious or substantial. *See id.* at ¶ 71 (noting that even under the harmless error standard, "the trial court's error in admitting parts of the investigator's testimony did not substantially influence the verdict or affect the fairness of the trial proceedings and does not require reversal of defendant's . . . convictions").

## E. Cumulative Error

¶ 61 Kane argues that the cumulative effect of the errors throughout his case deprived him of a fair trial. We disagree.

¶ 62 For us to reverse based on cumulative error, we must identify multiple errors that collectively prejudiced Kane's substantial rights, even if any single error doesn't. *See Howard-Walker v. People*, 2019 CO 69, ¶ 25. While we acknowledge that some errors may have occurred, cumulatively, the errors did not "affect[] the fairness of the trial proceedings [or] the integrity of the fact-finding process" and don't require reversal. *Id.* at ¶ 24 (citation omitted).

## III. Disposition

¶ 63 The judgment is affirmed.

JUDGE FOX and JUDGE BROWN concur.

33